**J. N. RANDALL, Sr., and American International Telephone Co., Plaintiffs-Appellees,**

v.

**H. NAKASHIMA & CO., LTD., Defendant-Appellee,**

**United States of America, Defendant-Appellant.**

No. 75–1626.

United States Court of Appeals, Fifth Circuit.

Nov. 12, 1976.

Wayman G. Sherrer, U. S. Atty., Charles D. Stewart, Asst. U. S. Atty., Birmingham, Ala., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Chief, Appellate Section, Gary R. Allen, Dennis M. Donohue, Ernest J. Brown, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Dewayne N. Morris, Birmingham, Ala., for J. N. Randall, Sr., et al.

Hubert A. Grissom, Jr., Birmingham, Ala., for H. Nakashima & Co., et al.

Before RIVES, GOLDBERG and GEE, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case we re-enter the tortured meanderings of federal tax lien law, intersected now by the somewhat smoother byway of the Uniform Commercial Code. *See Texas Oil & Gas Corporation v. United States,* 466 F.2d 1040, 1041 (5th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973). We must decide between the competing claims to a PBX line telephone system asserted by the government, pursuant to duly filed federal tax liens, and the party to whom the delinquent taxpayer subsequently conveyed his rights in the telephone equipment. The question presented is whether the taxpayer, who conveyed his interest in the PBX equipment before he acquired legal title thereto under a partially executed contract, ever had "property" or the "right to property" such that the federal tax lien, filed prior to the conveyance, attached under Section 6321[1] of the Internal Revenue Code of 1954.[2]

The parties to the case at bar have equated property with enforceable legal title thereto. Accordingly, they have chosen an ancient battleground, arguing and briefing the case as though it were a metaphysical problem, as though "legal title" were some noumenal quality that inhered for an infinitesimal duration in the taxpayer despite his attempt to divest himself of it. We believe the parties might better have addressed themselves to the question whether the taxpayer had "property" before he or his as-signee acquired legal title to the PBX system. In short, we think that the taxpayer's contract rights under a partially executory contract for the PBX equipment themselves constituted "rights to property" such that the tax lien attached before the rights were assigned or the contract was fully performed.

I. Facts

On April 18, 1973, Alton M. Hambric (taxpayer), North American Telephone Corporation (NATC), and its principal shareholder, H. Nakashima and Company (Nakashima), entered into an agreement whereby Nakashima agreed to exchange a PBX line telephone system and other consideration for 5,000 shares of NATC stock owned by Hambric. On the same day, Hambric delivered 2,000 shares of his NATC stock to Nakashima, and NATC executed a bill of sale conveying the PBX system to Hambric. The bill of sale conditioned transfer of title in the equipment on Hambric's delivering the remaining 3,000 shares of NATC stock within two days. Hambric was not immediately free to transfer the 3,000 shares, having previously pledged them to J. N. Randall to secure the latter's $25,000 loan to Hambric.

In order to free the remaining shares of his NATC stock, Hambric executed a "bill of sale" on April 19, 1973, by which he transferred to Randall's corporation, American International Telephone Company (AITC), for good consideration all rights and interests in the PBX equipment con-

---

**1.** 26 U.S.C. § 6321 (1970) provides:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

**2.** In answering this question in the affirmative, we further circumscribe the "no property" rule that, prior to the 1966 amendments to the federal tax lien provisions, had engaged the fancy of some courts. The rule was evolved largely in response to the Supreme Court's enunciation of the "choateness" doctrine in *United States v. R. F. Ball Construction Co.,* 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510 (1958), which established that an assignment of accounts receivable or other security interests "not perfected" and therefore "inchoate" according to federal standards would be subordinated to a federal tax lien arising *after* the assignment. In the early 1960s the courts, primarily to relieve private creditors from the harsh results of the "choateness" doctrine, developed the "no property" rule to dismiss federal tax liens when the taxpayer had alienated his property to his creditors so that he retained no interests therein or when the taxpayer had never had vested rights to the property.

veyed to him by the previous day's bill of sale from NATC.[3] On the same day, Randall released Hambric's 3,000 shares of NATC stock. On the following day, April 20, 1973, the secretary of NATC verified receipt of stock certificates representing the 3,000 shares.[4]

When the dust settled, AITC apparently had title to the PBX system and Nakashima had 5,000 shares of NATC stock. Neither Randall nor Nakashima had actual knowledge that the United States had filed notices of federal tax liens against Hambric in Jefferson County, Alabama, on January 7, 1971, and April 11, 1973. The Internal Revenue Service seized the PBX equipment, which was located in an NATC warehouse, on June 7, 1973.

Randall and AITC sought, *inter alia,* a determination that AITC owned the equipment free of the government's liens. The District Court held that because AITC had acquired Hambric's contractual right to the PBX equipment, upon Hambric's delivering the 3,000 shares of NATC stock in satisfaction of the condition precedent specified in the April 18 bill of sale, legal title vested not in Hambric but in AITC, which took the equipment free of the government's tax liens. The Court also ruled that the liens did not attach to the stock transferred to Nakashima. The Government has brought this appeal, apparently contesting only the court's order regarding AITC.[5]

## II. Property or Rights to Property

The threshold question in any case involving the federal government's assertion of its tax lien is whether and to what

extent the taxpayer had "property" within the meaning of the federal tax lien statute. Section 6321 of the Internal Revenue Code affords the government a lien for delinquent taxes upon "all property and rights to property" belonging to the taxpayer. The government's lien extends to after-acquired property. *Glass City Bank v. United States,* 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945). The Supreme Court has held that federal law controls on matters of priority once it is determined that a tax lien attaches. *See United States v. City of New Britain,* 347 U.S. 81, 86, 74 S.Ct. 367, 98 L.Ed. 520 (1954). The Court has also held that state law determines whether the taxpayer has property or the right to property to which the tax lien may attach. *See Aquilino v. United States,* 363 U.S. 509, 512–14, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960).

The Supreme Court has not made clear whether state law merely determines the existence of an interest that must then be classified according to federal law to determine whether it is property subject to the lien, or whether state law controls both the existence and classification of rights. In *Glass. City Bank v. United States, supra,* the Court declared in dictum that whether "future earning capacity" was property or a right to property was "not to be determined by resorting to the local law of Pennsylvania." 326 U.S. at 268, 66 S.Ct. at 110. In *United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135, the Court said that the federal tax lien provision "creates no property rights but merely attaches consequences, federally defined, to rights

---

**3.** Randall had in turn pledged the 3,000 shares to Gulf National Bank to secure a $25,000 loan. On April 19, 1973, the bank released the 3,000 shares to Randall who then released the shares to Hambric. Randall substituted the PBX system for the stock as collateral for the loan. He accomplished this by substituting the bill of sale executed by Hambric to AITC for the stock certificates.

**4.** Following the procedure adopted by the parties at oral argument, for purposes of this analysis Nakashima and NATC on the one hand, and Randall and AITC on the other, are to be treated as identical.

**5.** The lower court was clearly correct in ruling that the liens did not attach to the stock transferred to Nakashima. Federal tax liens are not valid against a purchaser of a security who takes without actual notice or knowledge of such liens. 26 U.S.C. § 6323(b)(1)(A) (1970). Therefore this aspect of the court's order must be affirmed. The holder of the PBX equipment is not similarly shielded by the "actual knowledge" provision, which protects only certain enumerated interests.

created under state law." The case relied on as authority for that statement, *Fidelity & Deposit Co. v. New York City Housing Authority,* 241 F.2d 142, 144 (2d Cir. 1957), clearly states that "the statute was fashioned to require the courts to determine for federal purposes whether those state-created interests are 'property' or 'rights to property.'" All of this appears to indicate that a federal court looks to state law to determine whether an interest exists, and then determines under a federal standard whether such an interest amounts to a "property" interest.

There are dicta in several Supreme Court opinions, however, that suggest a different approach. In *Aquilino v. United States, supra,* 363 U.S. at 513–14, 80 S.Ct. at 1280, the Court relied on *Bess* but appeared to limit the reach of federal law to the determination of priorities, saying that "once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which . . . determines the priority of competing liens . . . ." In *Meyer v. United States,* 375 U.S. 233, 236, 238, 84 S.Ct. 318, 320, 321, 11 L.Ed.2d 293 (1963), the Court cited *Bess* but observed that "our recent cases . . . [hold] that state law controls the determination of what is included within . . . 'property or right to property' . . . ."

Succinctly stated, the issue is whether a federal tax lien attaches if and only if the taxpayer holds an interest recognized as a "property" interest under state law. Conceivably there are interests recognized but not specifically labelled "property" interests under state law to which the tax lien would attach.[6] We seemed to be intimating such a distinction in our most recent tax lien case, *United States v. Citizens and Southern National Bank,* 538 F.2d 1101 (5th Cir. 1976). In that case we said that "having

determined that a depositor in a Georgia bank is vested with a chose in action, we look to federal law to determine whether a chose in action is property or rights to property under §§ 6321 and 6331."

We need not resolve these doctrinal ambiguities in the case at bar, because under both federal and state standards the taxpayer's contract right to the PBX equipment constituted a right to property, so that the federal tax lien attached on April 18 and was not ousted by any subsequent transaction.

### III. The Taxpayer's Contract Right

Alabama has adopted the Uniform Commercial Code. *See* Code of Ala., Tit. 7A, § 1–101 *et seq.* It is the appellees' position in this case that because the taxpayer lacked the right to demand legal title to the PBX equipment prior to the time he transferred his interest in such equipment to Randall, the taxpayer at no time had property or the right to property. This contention founders on the Code provisions that treat a contract right itself as a property right. *See* Code of Ala., Tit. 7A, §§ 9–102, –106, –204.

Section 9–106 of the Alabama Code defines "contract right" as "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper."[7] Section 9–102(1)(a) specifically identifies a contract right as a property right. That section refers to a security interest "in personal property or fixtures *including* goods . . . or *contract rights.*" (emphasis added) Under the Code, contract rights may not only be pledged as collateral, they may be sold. Indeed, § 9–102(1)(b) makes the Code's priority provisions specifically applicable to sales of contract rights. Therefore, under

---

**6.** One rationale for this approach is that state "labels" should not control "where the realities—the beneficial incidents of ownership—belie them." *See* Note *Property Subject to the Federal Tax Lien,* 77 Harv.L.Rev. 1485, 1486–87 (1964) (hereinafter Harvard Note).

**7.** The Comment under § 9–106 elaborates on the scope of the term, "contract right," observ-

ing that "[i]t has been found advisable to distinguish rights earned from rights not yet earned for several reasons. The recognition of the 'contract right' as collateral in a security transaction makes clear that this Article rejects any lingering common law notion that only rights already earned can be assigned."

applicable Alabama law the taxpayer's rights under the partially executed contract constituted a property right.

As a matter of federal policy as well, the taxpayer's contract right constituted a property right. Moreover, the federal tax lien attached to this property right. This result both accords with common sense and effectuates the intent of Congress relative to the tax lien provisions.

The taxpayer's right to the proceeds of his contract with NATC possessed a realizable value. Even when wholly executory, the option to purchase the PBX was worth something, since increases in the value of the PBX would have accrued to the taxpayer. In this case, of course, the contract had been partly executed, since the taxpayer had conveyed 2,000 shares of NATC stock to Nakashima. Whatever value the contract right had before this part performance was enhanced by the conveyance of the stock. To begin with, the part performance removed an element of uncertainty from the transaction that increased the value of the expectation interest. More important, the taxpayer's conveyance of 2,000 of the promised 5,000 shares would give rise to an action for unjust enrichment for the value of the 2,000 shares should the other party refuse to perform. Because the taxpayer's contract right was a valuable and transferable interest, it would be scholastic indeed to deny that it was a property interest to which the federal tax lien might attach. The statutory purpose of assuring collection strongly suggests that such interests should be subject to the lien to discourage transfers by the taxpayer aimed at defeating the rights of the government. *See* Harvard Note, note 6 *supra*, at 1503.

This result is consistent with the legislative history of the tax lien provisions. In 1966 Congress amended 26 U.S.C. § 6323. The amendments are

".  .  . in part an attempt to conform the lien provisions of the internal revenue laws to the concepts developed in this Uniform Commercial Code. It represents an effort to adjust the provisions in the internal revenue laws relating to the collection of taxes of delinquent persons to the more recent developments in commercial practice.  .  .  ."

S.Rep.No.1708, 89th Cong., 2d Sess. (1966); *see also* H.R.Rep.No.1884, 89th Cong., 2d Sess., U.S.Code Cong. & Admin.News, p. 3722 (1966). We have already remarked that many sections of the Code concern the interests of secured parties in contract rights, and that such rights appear to be property rights under the Code. Indeed, one commentator has observed that the amendments to § 6323 "will not yield sense if a taxpayer's contract rights cannot be 'property.' " Young, *Priority of the Federal Tax Lien*, 34 U.Chi.L.Rev. 723, 745 (1967). It would therefore frustrate the attempt to make the tax lien provisions consistent with modern commercial concepts as codified in the Uniform Commercial Code to deny that the taxpayer's contract rights were property rights to which the federal tax lien may attach.[8]

In short, the taxpayer's contingent right to the proceeds of the contract had a presently realizable value that he sought to divert from satisfaction of his tax debt. Under applicable Alabama law, the taxpayer could assign, pledge, or sell this value. To deny the government the protection of the lien on the contract right would be to deny it the reach of other secured creditors under the Uniform Commercial Code.

Because a taxpayer's rights under an insurance policy can be "borrowed against, assigned or pledged," the Supreme Court had held that the federal tax lien attaches to the cash surrender value of the policy when a tax lien that arose against the insured during his lifetime is asserted after his death against the proceeds of the policy. *United States v. Bess, supra*, 357 U.S. at 56, 78 S.Ct. at 1058. Even in this case, of course, the cash surrender value of the policy is contingent on the taxpayer's election

---

8. Cases cited by the appellees that hold that contingent obligations are not normally subject to garnishment are inapposite. By this analogy, the appellees compare the government to a class of creditors to which it is superior. *See* Harvard Note, note 6 supra, at 1495.

actually to surrender it.[9] Other contingent interests have been held to constitute property even where the claim is uncertain as to liability.[10] Thus, in *United States v. Hubbell*, 323 F.2d 197, 200 (5th Cir. 1963), this Court held that an "unliquidated claim sounding in tort" was property or a right to property in the same manner as "any unliquidated contract claim is so considered," and that the taxpayer's assignees had taken subject to the lien. We rejected the assignees' argument that because the taxpayer had only a right to file suit, which might not have yielded any recovery at all, the lien could not attach.

Other courts have held that an executory contract right is property such that the federal tax lien attaches. In *Seaboard Surety Company v. United States*, 306 F.2d 855 (9th Cir. 1962), the Ninth Circuit said that the federal government's tax lien survived an assignment of proceeds under an executory contract. In that case, after the government had filed tax liens, the taxpayer assigned proceeds of an executory contract to a trustee. When the taxpayer performed under the contract, the trustee was faced with competing claims of creditors and the government to the taxpayer's proceeds. The court said that "the trust agreement . . . could not displace the tax liens, which had already attached to taxpayer's property rights in the contract. The fact that taxpayer's rights under the

contract were dependent upon its performance did not affect the tax liens." *Id.* at 859. *See also Nevada Rock and Sand Co. v. United States Department of Treasury Internal Revenue Service*, 376 F.Supp. 161 (D.Nev.1974) (assignor of contract rights in partially executory contract possessed property interest in contract rights sufficient to allow attachment of tax lien); *Randall v. Colby*, 190 F.Supp. 319, 341 (N.D.Iowa 1961); *cf. City of Vermillion v. Stan Houston Equipment Co.*, 341 F.Supp. 707, 713 (D.S.D.1972).

■ We hold that the taxpayer's rights in the partially executed contract were property or the right to property such that the federal tax lien attached before the taxpayer conveyed his contract rights. The lien applies to "property owned by the delinquent at any time during the life of the lien," *Glass City Bank v. United States*, *supra*, 326 U.S. at 268–69, 66 S.Ct. at 110, and it cannot be displaced by subsequently acquired rights of third parties.[11]

We are aware, to be sure, that in cases in which a taxpayer has only a right to payment contingent on an external event or the tender of performance by him, some courts have held that he does not have an interest in property to which the lien may attach. *See, e. g., In re Halprin*, 280 F.2d 407 (3rd Cir. 1960); *United States v. Long Island Drug Company*, 115 F.2d 983 (2nd

---

**9.** In *Bess*, the insured did not make this election before he died. *Cf. United States v. Mitchell*, 349 F.2d 94, 101–06 (5th Cir. 1965).

**10.** *See, e. g., Bensinger v. Davidson*, 147 F.Supp. 240 (S.D.Cal.1956) (where conditional vendee of land defaulted in his payments and surrendered possession, lien attached to his cause of action for unjust enrichment *qua* property).

**11.** *Cf. United States v. Trigg*, 465 F.2d 1264 (8th Cir. 1972) *cert. denied*, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973). In that case, the taxpayer assigned its rights to accounts receivable as collateral security *before* the government filed a tax lien, but the assignee did not perfect its interest under the Uniform Commercial Code. The court said that the United States qualified as a lien creditor and that its lien attached to the accounts receivable of the taxpayer and took priority over the as-

signee's unperfected security interest. The court said that the taxpayer's assignment of accounts receivable did not divest the taxpayer of any property interest in the progress payments.

Because we hold in the instant case that the federal tax lien attached to the taxpayer's contract rights before he assigned them, we need not reach the question primarily addressed by the parties—whether the taxpayer's assignment divested the taxpayer of property or the right to property. The appellees argue that the taxpayer never had property, even when the contract was fully executed and the PBX system passed to his assignee. The government argues that despite the assignment, legal title passed through the assignor to the assignee, so that the taxpayer possessed, even if only for an instant, title to the PBX system. We decline to engage in this conceptualism.

Cir. 1940); *Home Insurance Company v. B. B. Rider Corporation*, 212 F.Supp. 457 (D.N. J.1963). In the leading case upholding this view, *In re Halprin*, the taxpayer-debtor had assigned to S proceeds of an unperformed contract that he could not have performed without S's advance. At the same time the taxpayer secured from the other party to the still-executory contract an acknowledgement of the assignment and a written promise to make payments directly to S. The issue was whether the taxpayer had rights in the proceeds of the contract previous to the assignment sufficient for a tax lien to attach. The court held that until S furnished the necessary money the taxpayer's contract rights were not property of the taxpayer. The court reasoned that only by conferring an equivalent benefit could the promisee of an executory contract "acquire an enforceable right to the promised payment." *In re Halprin*, 280 F.2d at 410. Prior to S's financing, it was "entirely uncertain whether the conditional promise to pay will ever become . . . enforceable."

*Halprin* has been roundly criticized in the literature. Of that court's conclusion that the taxpayer's contract right did not constitute property, Professor Young remarks that it "was a dubious position." Young, *Priority of the Federal Tax Lien*, 34 U.Chi. L.Rev. 723, 745 (1967). Professor Coogan labels *Halprin* "[a]n extreme case in which the 'no property' concept was applied," and observes: "The case seems not to have been followed to any extent under similar circumstances." Coogan, *The Effect of the Federal Tax Lien Act of 1966 upon Security Interests Created under the Uniform Commercial Code*, 81 Harv.L.Rev. 1369, 1373 (1968). Even assuming *arguendo* that *Halprin* is applicable to the case at bar, we also decline to follow that decision.

*Halprin* was markedly different on its facts from the case at bar. In that case, the transaction was essentially similar to a purchase money mortgage situation. The court was persuaded by this analogy, and advanced two policy arguments in support of its result. First, it suggested that S, the finance company, which made it possible for the taxpayer-debtor to complete the contract, should be able to levy on its proceeds ahead of other creditors for the same reasons that a purchase money mortgagee is allowed to prevail over a prior lienor claiming under an after-acquired property clause. Second, the court reasoned that allowing the lien to attach to the taxpayer's contract right would deprive the taxpayer of necessary financing and thus destroy the earning and hence taxpaying power of the burdened business.[12] There is authority that would support the proposition that a purchase money mortgagee is entitled to a superior position under the federal tax lien provisions. This preference is based on the theory that the property subject to a purchase money mortgage is not the property of the taxpayer but rather of the mortgagee. *See Allan v. Diamond T Motor Car Company*, 291 F.2d 115 (10th Cir. 1961).

In order for a purchase money mortgagee to attain a superior position, however, he is required to ensure that the mortgage is a completely perfected interest under applicable state law. *See Allan v. Diamond T Motor Company, supra*, 291 F.2d at 118. In this case, for AITC to have perfected its position under Alabama law on the theory

12. Two responses might be made to the policy arguments offered in *Halprin*. First, the equitable reimbursement argument has been found unpersuasive by the Supreme Court in the context of denying to mechanic's lienors compensation from contract proceeds that their efforts had helped earn for the taxpayer-contractor, even though they had completed their performance before the existence of the tax lien was revealed. *See United States v. White .Bear Brewing Company*, 350 U.S. 1010, 76 S.Ct. 646, 100 L.Ed. 871 (1956) (per curiam); Harvard Note, note 6, *supra*, at 1496. Second, holding that an executory contract right is a property right to which the tax lien may attach may not preclude a financing arrangement in the above situation. The taxpayer would be free to arrange in the original contract that all proceeds under the contract be paid directly to the financing company. Under this arrangement the contract could be completed and the previously arising tax lien might be held never to have attached because the taxpayer never had even a contingent or executory right to receive the proceeds of the contract. *See* Harvard Note, note 6, *supra*, at 1496.

that it had a purchase money security interest in the equipment, it would have had to file this interest with appropriate state authorities. *See* Code of Ala., Tit. 7A, § 9–302. *Cf. Galleon Industries, Inc. v. Lewyn Machinery Company, Inc.*, 50 Ala.App. 334, 279 So.2d 137, 141 (1973). It failed to do so. In any event, the case at bar is distinguishable from *Halprin* in an important respect. In *Halprin*, prior to the taxpayer's assignment of future earnings under the contract, the contract was wholly executory; neither party had begun to perform. In this case, prior to the taxpayer's agreement with Randall and AITC, the taxpayer had already conveyed 2,000 of the promised 5,000 shares to Nakashima. When the taxpayer conveyed to AITC his contract right in the PBX system, that right was already worth something—at least 2,000 shares of stock and an option on the PBX.[13]

Insofar as *Halprin* flatly requires that there be "an unqualified obligation to pay" under a contract before the contract right rises to the status of property or the right to property belonging to the taxpayer, however, we disagree with that decision. Instead, we follow the course set in our previous decision in *United States v. Hubell, supra*, the weight of authority in the literature, and what we think is a more realistic perspective on modern commercial transactions.

In holding that the taxpayer's contract right was property or a property right for purposes of 26 U.S.C. § 6321, we recognize that property is an expanding concept. Modern commercial transactions have spawned species of rights that the common law of years anon could not have envisaged. The era of seisen and tail has long vanished. Puts and calls, hedges and options are, analytically, property insofar as their possessor may realize something from their transfer.

"Property" is not to be confined in a juridical straitjacket.

The central argument of the appellees is that the taxpayer never had legal title to the PBX, because the right to such title had been assigned. When the contract was fully performed and the right matured, then and only then, according to the appellees, was there "property." Because the assignee had legal title to the PBX as soon as the contract right matured, the taxpayer could never have had legal title; hence he had "no property" to which the lien could attach.

The argument is thus similar to that against which Professor Gilmore, a severe critic of the "no property" rule, has inveighed.[14] He recounts contemporary suggestions that security arrangements might be insulated from federal tax liens by "the simple device" of giving the assignee or holder of a security interest "title" to the collateral instead of "a mere lien interest." For, as he asks rhetorically, "[w]hat is 'property' after all, but 'title'?"

Professor Gilmore's response is caustic: "These exercises in word magic have nothing whatever to recommend them. It seems in the highest degree unlikely that the power of the United States and the intellect of the judges would, alike, be overridden by a pun."

The drafters of the § 6321 were wise in using the words "property . . . or rights to property" instead of enumerating attributes or varieties of property rights. By this device they allowed the words that expansiveness, flexibility, and potential for growth with which our commercial world endows them in the marts of trade. A contingency that conditions acquisition of legal title does not render empty or valueless a contract right in the property sought

---

**13.** In the situation before us we focus upon the executory contract and the partial performance thereunder. Strictly speaking, we need not say whether an executory contract standing alone would be property. We need only say that at the moment when the taxpayer had partially performed under the contract and his contract rights were assignable under Alabama law, he possessed "property" or the "rights to proper-

ty." A bundle of rights to contractual consideration need not have present existentiality in order to be "property"; such rights may operate in the future as long as they have value in the present.

**14.** 2 G. Gilmore, *Security Interests in Personal Property* 1070–71 (1965).

to be acquired. The concept of property is not bound to the present. Congress, in enacting § 6321, knew that the forms and varieties of property would remain in flux, and that a definition capable of precisely capturing those valuable interests for the tax gatherers' harvest would elude it.

Congress did not attempt to define the commercial cosmos. Rather, it was perfectly willing to let contemporary transactions be analyzed to determine whether or nor the delinquent taxpayer had any part of a bundle of rights of commercial value, to which the tax lien would then attach.

In ancient days, the acquisition or alienation of property was governed by a formalism that marked by seal and solemnity the passing of title. In our own day, the electronic impulse must substitute for a handshake and a computer print-out for a seal. We locate property not through the nomenclature of title, but through the realities of the marketplace. The pertinent question in this case is, "was the interest of the taxpayer in the PBX system bargainable, was it transferable, did it have value?" We answer in the affirmative.

Accordingly, we reverse the judgment of the district court that AITC owned the PBX equipment free of the federal tax liens, and affirm the judgment of the district court as to defendant Nakashima. We remand this case for entry of an order consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.