994 F.2d 1069
 72 A.F.T.R.2d 93-5095, 61 USLW 2775,
93-1 USTC P 50,333,
Bankr. L. Rep. P 75,279
 In re ATLANTIC BUSINESS AND COMMUNITY DEVELOPMENT CORPORATION, Debtor,
INTERNAL REVENUE SERVICE,
v.
Thomas J. SUBRANNI, Trustee,
United States of America, Appellant.
 No. 92-5561.
 United States Court of Appeals,
Third Circuit.
 Argued April 27, 1993.
Decided June 7, 1993.
 
 James A. Bruton, Acting Asst. Atty. Gen., Michael Chertoff, U.S. Atty., Gary R. Allen, Kenneth L. Greene, Bridget Rowan, (Argued), U.S. Dept. of Justice, Tax Div., Washington, DC, for appellant U.S.
 Nona L. Ostrove, (Argued), Subranni & Ostrove, Atlantic City, NJ, for appellee Thomas J. Subranni, Trustee.
 Present: BECKER, HUTCHINSON and WEIS, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Appellant the United States of America, through its Internal Revenue Service ("IRS"), appeals an adverse ruling of the United States District Court for the District of New Jersey which held that a broadcasting license granted by the Federal Communications Commission ("FCC") is not "property" subject to a lien under section 6321 of the Internal Revenue Code, 26 U.S.C.A. § 6321 (West 1989). The IRS contends that the proceeds from the sale of the license in a Chapter 7 bankruptcy proceeding are subject to its lien. The bankruptcy trustee, on the other hand, contends that a longstanding FCC prohibition against treating the licenses as property, coupled with legal authority denying private creditors any interest in broadcasting licenses, compels a contrary conclusion. Because we believe the policy behind the FCC's refusal to recognize liens obtained by private creditors against a broadcasting license is not applicable to the IRS's assertion of a secured claim in bankruptcy against the proceeds of a bankruptcy sale, we hold that a section 6321 lien does attach to the proceeds of a Chapter 7 sale. We note particularly that the FCC does not object to the sale of the FCC license issued to the debtor under the supervision of the bankruptcy court but has instead approved it. We will therefore reverse the order of the district court denying the IRS a lien against the proceeds of the bankruptcy sale attributable to sale of the license itself.
 
 
 2
 The bankruptcy court had jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 157(b)(2)(K) (West Supp.1993). The district court had jurisdiction over the appeal from the bankruptcy court pursuant to 28 U.S.C.A. § 158(a) (West Supp.1993). We have appellate jurisdiction over the government's appeal from the order of the district court pursuant to 28 U.S.C.A. § 158(d) (West Supp.1993).
 
 I.
 
 3
 On May 15, 1986, Atlantic Business and Community Development Corporation ("Atlantic") filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. On July 14, 1987, the United States filed a timely proof of claim on behalf of the IRS for unpaid employment taxes, plus statutory additions in the total amount of $322,008.77. The proof of claim the IRS filed identified $267,429.39 as a secured claim because of federal tax liens that were perfected before the bankruptcy petition was filed.
 
 
 4
 The United States Trustee appointed Thomas J. Subranni ("Trustee") to administer the estate while the case proceeded through Chapter 11. Subsequently, the Trustee moved to convert the case into a Chapter 7 liquidation. The bankruptcy court granted that motion and the Trustee continued to administer the estate after conversion.
 
 
 5
 Under order of the bankruptcy court, the Trustee sold the assets of Atlantic's bankrupt estate. The United States asserted a secured claim against the resulting fund by virtue of the tax lien it had previously asserted against the debtor. To resolve the government's claim, the Trustee filed an adversary proceeding to establish the extent and validity of the government's liens and, in particular, to determine whether the liens attached to a broadcast license the FCC had issued to Atlantic. The parties cross-moved for summary judgment. The bankruptcy court held that the lien did not attach to the broadcast license and entered judgment for the Trustee. The government appealed and the district court affirmed on July 31, 1992. The government filed its timely notice of appeal on September 29, 1992.
 
 II.
 
 6
 Atlantic, a New Jersey corporation, owned an AM radio station in Atlantic City, New Jersey using the call letters WUSS. Atlantic operated WUSS pursuant to a broadcast license it had obtained from the FCC prior to filing its bankruptcy petition.
 
 
 7
 In 1986 Atlantic sought protection under Chapter 11 of the Bankruptcy Code. Following a failed reorganization attempt, on motion of the Trustee the case was converted to a Chapter 7 proceeding. Subsequently, the bankruptcy court authorized the Trustee to sell all the assets of WUSS-AM.
 
 
 8
 Before the sale, the Trustee retained an appraiser who inventoried, itemized, and valued the station assets. The appraiser determined the station had assets worth $254,283, including the value of the license which the appraiser set at $250,000. The sale proceeded with the government and the Trustee agreeing that all liens would be transferred to the fund acquired from the sale, retaining whatever priority they had in the property to be sold, with the further understanding that the validity and priority of those liens would be subsequently litigated. On December 14, 1988, the Trustee entered into an agreement of sale for the station and all its assets. The agreement transferred the station and its license to James Cuffee for $350,000 pending FCC approval of the assignment of the license. The FCC approved the assignment and the Trustee received the entire purchase price.
 
 
 9
 The Trustee brought an adversary proceeding to determine the government's interest in the proceeds from the sale of the license and station. After cross-motions for summary judgment, the bankruptcy court held that the FCC license did not qualify as property or an interest in property to which a tax lien could attach under section 6321 of the IRS Code.[1] Accordingly, the court held the government had no lien on any funds the bankruptcy estate received attributable to assignment of the license. The district court affirmed and the government appealed.
 
 III.
 
 10
 The only issue in this case is the construction of section 6321 of the Internal Revenue Code. This is a question of statutory interpretation subject to plenary review. See, e.g., Manor Care, Inc. v. Yaskin, 950 F.2d 122, 124 (3d Cir.1991); see generally 21 West Lancaster Corp. v. Main Line Restaurant, Inc., 790 F.2d 354 (3d Cir.1986) (exercising plenary review over whether section 6321 reaches state liquor license).
 
 Section 6321 provides:
 
 11
 If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.
 
 
 12
 26 U.S.C.A. § 6321. The government asserts a section 6321 lien on Atlantic's assets for unpaid employment taxes. These liens reach property in the violator's possession at the time of the lien as well as after-acquired property. Glass City Bank v. United States, 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945). Section 6321 should be interpreted broadly in order to effect the congressional purpose of making the property of a delinquent taxpayer available to satisfy his tax liability. See, e.g., United States v. National Bank of Commerce, 472 U.S. 713, 719-20, 105 S.Ct. 2919, 2923-24, 86 L.Ed.2d 565 (1985) ("The statutory language 'all property and rights to property,' appearing in § 6321 ... is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have.").[2] It is well settled that federal tax liens reach interests immune from attachment by private creditors. See, e.g., United States v. Rodgers, 461 U.S. 677, 697, 103 S.Ct. 2132, 2144, 76 L.Ed.2d 236 (1983). Federal law determines whether statutorily created interests include property rights to which a federal tax lien may attach. 21 West Lancaster Corp., 790 F.2d at 356; Bavely v. United States (In re Terwilliger's Catering Plus, Inc.), 911 F.2d 1168, 1171 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2815, 115 L.Ed.2d 987 (1991); see also In re Halprin, 280 F.2d 407, 409 (3d Cir.1960) ("[T]he ultimate question whether an interest thus created and defined falls within a category stated by a Federal statute requires an interpretation of that statute, which is a Federal question.").
 
 
 13
 The government likens the instant situation to state liquor licenses which both federal and state courts have held are property within the reach of section 6321's lien. See, e.g., 21 West Lancaster Corp., 790 F.2d at 358 (Pennsylvania liquor license); see also United States v. Battley (In re Kimura), 969 F.2d 806, 811 (9th Cir.1992) (Alaskan liquor license); Terwilliger's Catering, 911 F.2d at 1171-72 (Ohio liquor license); Kempf v. IRS (In re American Way Food Serv. Corp.), 48 B.R. 79, 82 (Bankr.W.D.Mich.1985) (Michigan liquor license). For example, in Boss Company v. Board of Commissioners, 40 N.J. 379, 192 A.2d 584 (1963), the New Jersey Supreme Court held that section 6321 reached a liquor license, id. 192 A.2d at 587, despite the presence of a state statute that provided, " 'Under no circumstances' " could a liquor license " 'be deemed property, subject to ... lien, ... seizure for debts, or any other transfer or disposition whatsoever, except to the extent expressly provided by [state statute].' " Id. at 586 (quoting N.J.S.A. 33:1-26). Because the license was protected from arbitrary revocation or suspension and had transferrable value, the supreme court held it was property. Id. at 587.
 
 
 14
 In 21 West Lancaster Corp. v. Main Line Restaurant, Inc., we considered whether a liquor license was property or an interest in property under section 6321. We observed, "Courts confronting the question have generally classified as property or rights to property interests which can generate pecuniary value and are transferable." 21 West Lancaster Corp., 790 F.2d at 357; see Terwilliger's Catering, 911 F.2d at 1171. The ultimate inquiry is, " '[W]as the interest of the taxpayer ... bargainable, was it transferable, did it have value?' " 21 West Lancaster Corp., 790 F.2d at 357 (quoting Randall v. H. Nakashima & Co., Ltd., 542 F.2d 270, 278 (5th Cir.1976)). Despite the acknowledged facts that a Pennsylvania liquor license was a privilege and not a right under state law, that the state controlled its alienability, and that it was beyond the reach of private creditors, we held that a liquor license was property within the meaning of section 6321 because it was alienable and had value. Id. at 356-58.
 
 
 15
 The government relies on our analysis in 21 West Lancaster Corp. and likens a radio license to a liquor license. Although an FCC license is not an indefeasible property right, see FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940) (license subject to suspension, modification, or revocation in public interest), nor can an individual "own" the license, see 47 U.S.C.A. § 301 (West 1991), the government contends the license has undeniable value under the standard we announced in 21 West Lancaster Corp. and, subject to FCC approval, may be transferred by the holder.[3] The FCC, however, exerts a great deal of influence over the holder of the license.[4] Because the license may not be altered, revoked or suspended without certain procedural safeguards, the government argues it has further attributes of property.
 
 
 16
 In an analogous situation, the United States District Court for the Northern District of New York held that various certificates of public convenience and necessity that the Interstate Commerce Commission issued to an individual engaged in the trucking and hauling business are property to which a section 6321 tax lien attaches. Fidler v. United States, 1972 WL 3117, ** 1, 5 & n. 42 (N.D.N.Y.1972). Their alienability is also limited. The court in Fidler explained,
 
 
 17
 To hold that either the Public Service Commission or Interstate Commerce Commission certificates are not property to which the government's tax lien attaches is to fly in the face of reality. Experience with the bankruptcy of common carriers demonstrates that often the most valuable assets disposed of by the trustee are the operating rights evidenced by Public Service Commission and Interstate Commerce Commission certificates.
 
 
 18
 Id. at * 5 (footnotes omitted).
 
 
 19
 The government also relies on the assumption that the Bankruptcy Code would treat an FCC license as property. The Trustee and the bankruptcy court implicitly treated the license as "property of the estate" under section 541 of the Bankruptcy Code. See 11 U.S.C.A. § 541(a)(1) (West 1993). There is some conflict in the case law on this point. Compare Shimer v. Fugazy, (In re Fugazy Express, Inc.), 124 B.R. 426, 430 (S.D.N.Y.1991) (broadcasting license property of the estate), appeal dismissed, 982 F.2d 769 (2d Cir.1992) with D.H. Overmyer Telecasting Co. v. Lake Erie Communications, Inc. (In re D.H. Overmyer Telecasting Co.), 35 B.R. 400, 401 (Bankr.N.D.Ohio 1983) (license confers rights that may be property of estate but it does not follow that license itself becomes property of debtor's estate). The meaning of the term "property" in section 541 of the Bankruptcy Code is not directly before us as it was so treated by the bankruptcy trustee without objection. In any event, the government contends that where a bankruptcy trustee disposes of an FCC license and retains the proceeds for the benefit of creditors, subject only to FCC approval of the transfer to the proposed transferee, the license has been treated as property.
 
 
 20
 The Trustee relies on two lines of cases for the proposition that the license is not section 6321 property. First are the United States Supreme Court decisions stating that an FCC license does not confer property rights. See Sanders Bros., 309 U.S. at 475, 60 S.Ct. at 697; FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 145-46, 60 S.Ct. 437, 442-43, 84 L.Ed. 656 (1940) (no right of priority for consideration of application conferred in Act). They seem to us, however, to have facts so dissimilar from this case that they are of little relevance. In Sanders Brothers, for example, the Court decided that a license did not create a vested property right, Sanders Bros., 309 U.S. at 475, 60 S.Ct. at 697, but it reached that decision in the course of holding the license did not have property attributes sufficient to impose on the FCC a duty to shield the license holders from competition. See id. at 475-76, 60 S.Ct. at 697-98.
 
 
 21
 We do not think Sanders Brothers holds that an FCC license has none of the attributes of property. The Communications Act itself seems to imply the existence of a limited property right in an FCC license once it is granted. Section 301 states that no license is to be "construed to create any right, beyond the terms, conditions, and periods of the license." 47 U.S.C.A. § 301 (emphasis added). We think this section implies the creation of rights akin to those created by a property interest limited only by the "terms, conditions and periods of the license."[5] Also indicative of a limited property interest are the procedural safeguards against arbitrary revocation of FCC licenses. See 47 U.S.C.A. § 312.
 
 
 22
 The second line of cases upon which the Trustee relies holds that FCC licenses are not property subject to lien or attachment by private creditors. In In re Merkley, 94 F.C.C.2d 829 (1983), the FCC announced its position that "a broadcast license, as distinguished from the station's plant or physical assets, is not an owned asset or vested property interest subject to a mortgage, lien, pledge, attachment, seizure, or similar property right." In Stephens Industries, Inc. v. McClung, 789 F.2d 386, 390 (6th Cir.1986), the court of appeals relied on Merkley to hold that an FCC license could not be used as collateral for a mortgage. The court rejected the creditor's theory that an FCC license was inseparable from the physical premises and, therefore, was included in the property covered by a security interest. Id. at 391; see In re Tak Communications, Inc., 985 F.2d 916, 918 (7th Cir.1993) (limited rights present in grant of FCC license did not make license property included within a security interest attaching to the licensee's property) (aff'g New Bank of New England, N.A. v. Tak Communications, Inc. (In re Tak Communications), 138 B.R. 568 (W.D.Wis.1992)).
 
 
 23
 The FCC adopted its policy against the recognition of private liens or security interests in broadcast licenses because their " 'hypothecation endangers the independence of the licensee who is and who should be at all times accountable to the Commission in the exercise of the broadcasting trust.' " In re Smith, 94 B.R. 220, 221 (Bankr.M.D.Ga.1988) (quoting Merkley, 94 F.C.C.2d 829).[6] In granting the government control over the airwaves, Congress intended to give the government a plenary power to regulate the broadcasting business. See Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 567, 110 S.Ct. 2997, 3010, 111 L.Ed.2d 445 (1990). If an FCC license were subject to a valid security interest, the FCC feared that the secured creditor might have the potential to force sale or reversion of the license in contravention of the statutory scheme and the agency's desire to insure the licensee's independence. See Tak Communications, 138 B.R. at 573-76; accord Smith, 94 B.R. at 221-22; see also Tak Communications, 985 F.2d at 918-19. It was felt that a private party with a lien on a broadcasting license would gain a degree of control over the license that it might exercise contrary to the public interest the FCC was created to protect.
 
 
 24
 The government responds that an IRS lien poses no such problem because it is the government, as representative of the public interest, that is asserting its lien in the license instead of a private creditor. We agree that the fear that a secured creditor would act contrary to the regulatory scheme is attenuated when the government asserts the interest and the risk of influence antithetical to the public is reduced, if not eliminated. Moreover, here the IRS's lien now attaches only to the proceeds of a transfer the FCC has approved. In this case we see no threat to the independence of the bankrupt licensee or the transferee of the license.[7]
 
 
 25
 We also think the cases that permit section 6321 liens on liquor licenses, despite the usually limited duration, restricted alienability, and strict control the issuing authority exercises over them, are closely analogous. See, e.g., 21 West Lancaster Corp., 790 F.2d at 356-58. We reject the Trustee's argument that the liquor license cases are distinguishable because liquor licenses may be transferred separately from the underlying establishment, a so-called "naked" transfer, unlike FCC licenses which must be sold with the tangible assets of the licensee. That difference does not seem to us material.
 
 
 26
 In 21 West Lancaster Corporation we looked to whether the license had value, not to whether its value depended on its attachment to another item. On the facts before us, the FCC license has been segregated from the value of the broadcaster's tangible assets by appraisal. The appraiser put a value of $250,000 on Atlantic's license before the Chapter 7 sale, apart from the value of any of its equipment or other assets. These tangible assets were appraised at less than $5,000 and sold in a package with the license for a total price of $350,000. Only the license can account for the purchaser's willingness to pay $345,000 more than the appraised value of the other tangible assets. A holding that the license had no independent value would, as the court stated in Fidler, "fly in the face of reality." Fidler, 1972 WL 3117 at * 5. The requirement that the license be transferred as a package with the licensee's other property, the limitations on its duration, and the requirement that the licensee had to obtain the FCC's consent before transfer, did not divest the FCC license of value. As we stated in 21 West Lancaster Corp., the relevant inquiry is whether the taxpayer's interest was bargainable, transferable, and valuable. 21 West Lancaster Corp., 790 F.2d at 357. In the case of the FCC license, the answer is yes to all three questions.
 
 
 27
 Finally, as the government notes, the license has already been treated by the parties as property of the estate under section 541 of the Bankruptcy Code. See Fugazy, 124 B.R. at 430. While its status as property under the Bankruptcy Code would not necessarily control its status as property within section 6321 of the Internal Revenue Code, we think the definition of property under section 6321 cannot be more limited than that of the Bankruptcy Code, considering Congress's intent to subject every possible property interest to section 6321's lien for unpaid taxes. See, e.g., Terwilliger's Catering, 911 F.2d at 1171-72 (holding liquor license to be property under both Internal Revenue Code and Bankruptcy Code).
 
 IV.
 
 28
 We hold that the broadcasting license is section 6321 property analogous to the liquor license we dealt with in 21 West Lancaster Corp. A liquor license and an FCC license resemble each other in the following respects: Both are granted at the discretion of the government, both are of limited duration, and both can be revoked for cause. The distinction arising out of the fact that a liquor license can be transferred apart from the licensee's other assets is immaterial. Atlantic's FCC license is plainly shown to have had value by the appraiser's report and the fact that another party paid $350,000 for it and other property that had been appraised at the relatively nominal value of $5,000.
 
 
 29
 The policy that prevents FCC licenses from being subjected to private liens is implicated only in an attenuated fashion when an IRS lien is transferred to the proceeds of an FCC approved bankruptcy sale of an FCC license issued to a bankrupt broadcaster. The Supreme Court's statements concerning property status of FCC license are made in a different context. To deny the IRS lien status in the situation before us would be contrary to the broad construction the Supreme Court teaches us we must give Internal Revenue Code section 6321.
 
 
 30
 Finally, it would also be inconsistent with Congress's intent to grant IRS a lien for unpaid taxes whenever possible if the parties were allowed to treat an FCC license as property of a bankrupt's estate under section 541 of the Bankruptcy Code but not as property subject to a lien under section 6321 of the Internal Revenue Code. For all these reasons we hold that the district court and the bankruptcy court erred in holding that an FCC license is not property within the reach of section 6321.
 
 
 31
 Accordingly, we will reverse the judgment of the district court and remand with instructions for it to remand this case to the bankruptcy court for further proceedings consistent with this opinion.
 
 
 
 [1]
 The order also determined that the IRS did not have a lien in any of the assets acquired by the debtor subsequent to the filing of the bankruptcy petition. See 11 U.S.C.A. § 552(a) (West 1979). The IRS conceded this point during the litigation and does not challenge this conclusion on appeal
 
 
 [2]
 A related treasury regulation emphasizes the same broad statutory purpose and specifically exempts from section 6321 only one type of property, restricted land held in trust by the United States for an individual noncompetent American Indian. See 26 C.F.R. § 301.6321-1 (1992)
 
 
 [3]
 An example of the limitation on the transfer of licenses is that an individual may not "traffic" in licenses by obtaining them for sale rather than for service. See Crowder v. FCC, 399 F.2d 569, 571 (D.C.Cir.), cert. denied, 393 U.S. 962, 89 S.Ct. 400, 21 L.Ed.2d 375 (1968)
 
 
 [4]
 The restrictions are set out at 47 U.S.C.A. §§ 301-399b (West 1991 & Supp.1993) ("Communications Act" or "Act"). Under the Act, the government is given the responsibility of controlling radio channels and the power to license their use for limited periods of time. Id. § 301. The FCC establishes qualifications for broadcasters, can compel the disclosure of certain information from them, and may grant or deny license applications in the public interest. See, e.g., §§ 303, 307, 308. A license is good for seven years, and renewal and transfer during that period are subject to FCC approval. Id. §§ 307(c), (d), 310(d). In approving transfers, the FCC is prohibited from determining whether another transferee would better serve the public interest but must confine its inquiry to whether the transfer under consideration is, itself, in the public interest. See id. § 310(d). The FCC may alter, suspend or revoke a license subject to certain procedural safeguards. See, e.g., § 312
 
 
 [5]
 In In re Welch, 3 F.C.C.Rcd. 6502 (1988), the FCC permitted the for-profit sale of a "bare" FCC authorization for unbuilt facilities. Reversing its previous position that sections 301 and 304 of the Act prohibited "bare" transfers because they implied a property interest in the license, the FCC reinterpreted them to prohibit assertion of property rights against the government. It went on to recognize that the licensee does have certain limited property rights upon an approved transfer, which permit the licensee to retain any consideration attributable to the transfer of the license itself
 
 
 [6]
 The FCC has approved the license transfer in this case but has not, to our knowledge, otherwise expressed an opinion on the issue considered herein
 
 
 [7]
 See In re Ridgely Communications, Inc., 139 B.R. 374, 378-79 (Bankr.D.Md.1992) (FCC policy against security interest implicates rights between licensee and government and does not reach right asserted by creditor in proceeds of sale after transfer). This case does not require us to reach the question whether the IRS could foreclose its lien against an active station by seizure of its license. A seizure of the license before FCC approval of any transfer has occurred poses issues not present in a case involving a right to the proceeds of a sale of a broadcast license