# Internal Revenue Service Notices of Levy on Undelivered Commerce Department Fishing Quota Permits

The Department of Commerce may lawfully withhold delivery of fishing quotas or quota shares to eligible fishermen under the federal fishery laws in order to comply with a notice of levy served on the Department by the Internal Revenue Service to satisfy federal tax delinquencies.

January 26, 1995

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF COMMERCE

This responds to your letter of November 4, 1994, requesting our opinion whether the Department of Commerce ("DOC") may withhold delivery of quota shares or individual fishing quotas issued to eligible fishermen under the provisions of federal fishery laws in order to comply with a notice of levy served on the DOC by the Internal Revenue Service ("IRS"), demanding that the permits be surrendered to IRS to satisfy tax delinquencies.[1] Upon receipt of your letter, we solicited and received a submission from the IRS setting forth its views on this inter-departmental dispute.[2]

We conclude that the IRS notices of levy may be lawfully applied to the undelivered quota shares and individual fishing quotas, and we find no legal basis for the DOC to refuse to comply with them. Our analysis follows.

## I. BACKGROUND

### A. *The Halibut and Sablefish Fishing Quota Programs*

The Secretary of Commerce ("Secretary") is authorized to maintain limited access to certain fisheries under the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1883 ("Magnuson Act"), and the Northern Pacific Halibut Act of 1982, 16 U.S.C. §§ 773–773k ("Halibut Act"). Under the authority of these acts, the Secretary has instituted a system whereby the allowable catch of a species is divided into shares or quotas, which are then allocated among the eligible fishermen.

The resultant system is based upon quota shares and individual fishing quotas ("IFQ"). A quota share is a long-term permit to fish for a particular species (here, halibut or sablefish) in a particular area. These shares are issued to "quali-

[1] Letter for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Ginger Lew, General Counsel, U.S. Department of Commerce (Nov. 4, 1994) ("DOC Ltr.").

[2] Letter for Richard Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, from Stuart L. Brown, Chief Counsel, Internal Revenue Service (Dec. 23, 1994) ("IRS Ltr."). In resolving this matter, we also considered the Letter for Jay S. Johnson, Deputy General Counsel, National Marine Fisheries Service, from Arnold E. Kaufman, Assistant Chief Counsel, Internal Revenue Service (Oct. 12, 1994) ("Kaufman Ltr.").

fied persons" — i.e., those who have owned or leased vessels which harvested halibut or sablefish during the qualifying years of 1988 through 1990. Quota shares (which are represented by Quota Share Certificates) are transferable to other qualified persons, subject to approval by the National Marine Fisheries Service ("NMFS"), the agency within DOC that administers the fisheries laws. *See* 50 C.F.R. §§ 676.20–21 (1995).

An IFQ is an annual permit issued only to the owners of quota shares.[3] In early 1995, the NMFS plans to issue IFQ's for halibut and sablefish based upon the ratio between a qualified fisherman's quota share and the total number of quota shares in the applicable pool for the species and area. The IFQ is represented by an "IFQ Annual Fishing Permit," certifying that the bearer may take a specified poundage of the indicated species in a specific area for the year in question. IFQ's may also be sold, leased, or otherwise transferred with NMFS approval. Only persons with IFQ's are allowed to fish for halibut and sablefish.

NMFS regulations state that quota shares and IFQ's are not absolute rights or interests subject to the Fifth Amendment's Takings Clause. *See* 50 C.F.R. § 676.20(g). Both DOC and IRS recognize that the quota shares and IFQ's are temporary, revocable, and alterable permits. At the same time, it is not disputed that both quota shares and IFQ's have monetary value and are, or will be, saleable in a secondary market.

From the standpoint of the federal fisheries laws, the purpose of the IFQ system was described as follows in commentary accompanying NMFS's promulgation of a Final Rule on this subject:

> [The IFQ] will modify the distribution of harvesting allocations among fishermen. Therefore, the IFQ program sustains existing management measures that prevent overfishing. Further, the IFQ program will improve the prevention of overfishing by providing for reductions in bycatch and deadloss that normally increase with increased fishing effort in open access fisheries.

58 Fed. Reg. 59,375, 59,377 (1993). The Commerce Department describes the purpose and effect of the IFQ system as follows:

> An IFQ system is considered to improve fishery management by decreasing fleet size and effort levels; dispersing fishing effort over a longer season; allowing a closer monitoring of landings; ameliorating unsafe fishing practices; reducing bycatch, deadloss, and lost fishing gear; enhancing the quality and price of fish landed; and

---

[3] As defined in the regulations at 50 C.F.R. § 676.11 (1995), an IFQ means:

[T]he annual catch limit of sablefish or halibut that may be harvested by a person who is lawfully allocated a harvest privilege for a specific portion of the total allowable catch of sablefish or halibut.

giving the participants more of a stake in the long-term health of the fishery.

DOC Ltr. at 2. Under the governing statutory criteria, allocations of these fishing privileges among U.S. fishermen must be: (1) fair and equitable to all such fishermen; (2) reasonably calculated to promote conservation; and (3) carried out in such a manner that no individual, corporation, or other entity acquires an excessive share of such privileges. 58 Fed. Reg. at 59,378.

NMFS was prepared to issue quota shares to qualified Alaska fishermen starting November 7, 1994. However, NMFS has withheld issuance of the quota shares to some 300 qualifying fishermen due to the notices of levy received from the IRS.

## B. *IRS Procedures and Actions*

On October 11, 1994, the IRS issued a Notice of Levy (IRS Form 668A) to the NMFS in Juneau, Alaska, asserting a lien for $8,793,465, in unpaid taxes, interest, and penalties owed by some 250 fishermen identified as delinquent taxpayers. The Notice stated: "This levy requires you to turn over to us this person's property and rights to property (such as money, credits, and bank deposits) that you have or which you are already obligated to pay this person." [4] By letter to the DOC dated October 12, 1994, the IRS further explained the nature of the levy it is asserting:

> Based on our understanding that the Halibut IFQs at issue are transferable and have value in the marketplace, we conclude that they constitute property or rights to property which are subject to the tax lien and levy. . . . The Service can levy on these rights by serving the levy on NMFS before NMFS actually transfers the IFQs to the delinquent taxpayers. Such a levy obligates NMFS to turn over to the IRS all IFQ rights of the taxpayers who are covered by the levy, including coupons, certificates or other documents which represent the IFQ rights.
>
> We note that the property interest which the Service is proposing to attach is only the taxpayers' right to receive the IFQs as determined by NMFS. Upon service of the levy, the Service will merely be "standing in the shoes" of the taxpayers and will be eligible to receive what the taxpayers were eligible to receive.

---

[4] Also on October 11, 1994, the IRS issued a Press Release announcing its action ("IRS Levies on Quota Shares"), stating: "The Internal Revenue Service (IRS) today took action which will prevent the issuance of halibut and sablefish quota shares to approximately 250 Alaska fishermen who owe back taxes." *Id.* at 1. The Release further stated: "This is the first in a series of IRS levies to NMFS [the National Marine Fisheries Service]. Subsequent levies will also include those fishermen who have failed to file one or more returns and who have not responded to IRS inquiries."

Kaufman Ltr. at 4 (footnote omitted).

An additional Notice of Levy issued October 19, 1994, brought the total of tax-delinquent fishermen covered by the notices to some 300. By letter dated November 16, 1994, IRS reiterated its demand that DOC turn over "all property and rights to property of the listed taxpayers pursuant to our levy authority under section 6331 [of the Internal Revenue Code], with respect to the updated list of taxpayers and tax liabilities which is attached." Letter for Steven Pennoyer, Regional Director, NMFS, from Charles M. Stromme, Chief, Special Procedures, IRS at 1 (Nov. 16, 1994). The letter further explained:

> The property and rights to property of the taxpayers in your posses-
> sion or control include the taxpayers' rights to receive permanent
> fishing allocations, known as Quota Shares, as well as the rights
> to receive annual allocations of poundage, known as Individual
> Fishing Quotas, pursuant to the fishery management programs for
> halibut and sablefish under your jurisdiction. Pursuant to section
> 6332 [of the Internal Revenue Code], this demand for turnover
> requires you to surrender this property and rights to property to
> the Internal Revenue Service.

*Id.* at 1–2.

## C. *Positions of the Agencies*

Although the DOC and IRS have differing views on the legal effect of the IRS levy on the issuance of quota shares and IFQ's, the agencies appear to be in agreement on one aspect of the matter. Specifically, the DOC letter states:

> The Department of Commerce does not question the IRS's
> authority to levy upon delinquent taxpayers' property, nor that these
> quota shares and IFQs might constitute the sort of property to which
> an IRS lien attaches. No doubt the IRS could serve a notice of
> levy on a permit holder, who would have to settle his debt or risk
> seizure and sale of the permit. The IRS, however, has not cited
> any precedent for enforcing a levy upon a Federal permit at the
> very moment it is issued by the agency, *before it is even in the
> hands of the permit holder, and before any monetary value is asso-
> ciated with it.*

DOC Ltr. at 3 (emphasis added). Consequently, the issue in dispute is not whether the IRS can properly levy upon quota shares or IFQ's as rights to property as

such, but whether it can do so *before* such rights have actually been issued and delivered to the taxpayers who have otherwise qualified for them.

## II. ANALYSIS

### A. *Property Interest Subject to Levy*

Section 6331(a) of the Internal Revenue Code provides that the Government may collect the taxes of a delinquent taxpayer "by levy upon all property and rights to property . . . belonging to such person." 26 U.S.C. § 6331(a). The scope of this authority has been broadly construed by the courts. In *United States v. National Bank of Commerce*, 472 U.S. 713, 719–20 (1985), for example, the Supreme Court observed: "The statutory language 'all property rights and rights to property,' appearing in § 6321 (and, as well, in §§ 6331(a) and, essentially, in 6332(a) . . .), is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have."

The rights subject to IRS levy include intangible personal property. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350 (1977). For example, the courts have upheld IRS authority to assert a levy against a delinquent taxpayer's state liquor license, *Paramount Finance Co. v. United States*, 379 F.2d 543, 544 (6th Cir. 1967), or federal broadcast license, *In re Atlantic Business and Community Development Corp.*, 994 F.2d 1069, 1075 (3d Cir. 1993). The key issue in such cases is whether the right at issue is transferable and has value. *See id.* at 1072 ([L]iquor license held to constitute property under § 6321 "because it was alienable and had value."); *21 West Lancaster Corp. v. Main Line Restaurant, Inc.*, 790 F.2d 354, 357 (3d Cir. 1986). Despite the recognition that licenses and permits are considered privileges and not rights under state law, that the state controls their alienability, and that they are beyond the reach of private creditors, the courts nonetheless treat them as property subject to levy within the meaning of § 6321. *In re Atl. Bus.*, 994 F.2d at 1072; *21 West Lancaster*, 790 F.2d at 356–58.

A third party served with an IRS notice of levy is required to surrender to the IRS all of the taxpayer's property (or rights to property) in its possession, except property subject to prior attachment or execution under judicial process. As stated by the Court in the *National Bank* opinion, when a levy is served upon a third party, the IRS "steps into the taxpayer's shoes" and acquires whatever rights the taxpayer himself possesses in property held by the third party. 472 U.S. at 725. That party's failure to comply with the levy results in liability to the IRS up to an amount equal to the value of the property that the party declines to surrender. 26 U.S.C. § 6332(d).

Here, the right at issue is a fisherman's right to be issued a quota share and IFQ by the NMFS, entitling him to catch certain quantities of a species of fish that is otherwise protected from fishing. It does not appear to be in dispute that,

once issued, the quota shares and IFQ's may be sold to others in a secondary market, and thus have marketable money value. The DOC has stipulated that "quota shares and IFQs might constitute the sort of property to which an IRS lien attaches" and that "the IRS could serve a notice of levy on a permit holder, who would have to settle his debt or risk seizure and sale of the permit." DOC Ltr. at 3.

We find no sound basis for concluding that the quota shares or IFQ's do not qualify as "property or property rights" generally subject to IRS levy under the governing provisions. The courts have held that such intangible interests as liquor licenses and broadcast licenses are subject to levy, and there appears to be no logical basis for distinguishing the fishing quota permits in that regard. *See generally* Jon David Weiss, Comment, *A Taxing Issue: Are Limited Entry Fishing Permits Property?*, 9 Alaska L. Rev. 93 (1992).

### B. *Levy Asserted Against Unissued and Undelivered Permit in Government Hands*

In the case of a delinquent taxpayer, §6331(a) authorizes the IRS to collect the tax due "by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax." Where the DOC has not yet issued or delivered a quota share or IFQ to a person, the question arises whether the quota or share in question—or the right to receive it—falls within the coverage of §6331(a).

Initially, the mere fact that the right to property at issue is in the hands of a government agency does not prevent the IRS from asserting a tax levy against it. As recognized by the court in *United Sand and Gravel Contractors, Inc. v. United States*, 624 F.2d 733, 736 (5th Cir. 1980):

> [T]here is nothing in the general levy authorization statute, I.R.C. §6331, excepting from its reach property which is in the hands of an agency of the United States. The authorization to collect unpaid taxes by levy applies to "all property and rights to property (except . . . property . . . exempt under section 6334)," *id.* (emphasis added), of the tax delinquent. *See Field v. United States*, 263 F.2d 758, 763 (5th Cir. 1959).

(Footnote omitted).

The more significant question is whether the undelivered fishing permits constitute property or rights to property "belonging to" the subject taxpayers, such as to fall within the coverage of 26 U.S.C. §§6321 (tax lien authority) and 6331 (tax levy authority). We believe that a government permit can be said to "belong" to a person for IRS collection purposes when all the necessary preconditions to

the issuance of the permit to that person have been fulfilled and all that remains is for the issuing agency to issue and deliver the permit. Under the analysis in the *National Bank* opinion, for example, the organization receiving a notice of levy must comply unless it is neither "in possession of" nor "*obligated with respect to*" the property or "rights to property" in issue. 472 U.S. at 721–22 (emphasis added). This opinion also stressed that the language of § 6331(a) was broadly intended by Congress "to reach every interest in property that a taxpayer might have." *Id.* at 719–20. Once a government agency becomes legally "obligated" to issue a license or permit to the taxpayer, we think the license can be said to "belong to" the taxpayer for purposes of IRS lien and levy authority.

These fishing quota permits constitute a right to intangible property — i.e., a valuable and transferable legal right to catch and land certain quantities of halibut or sablefish. Under 50 C.F.R. § 676.20(a) (1995), once a person's status as a "qualified person" is established, the NMFS Regional Director is obligated to assign such person a quota share. As that section states: "The Regional Director *shall* initially assign to qualified persons . . . halibut and sablefish fixed gear fishery QS [quota shares] that are specific to IFQ regulatory areas and vessel categories." *Id.* (emphasis added). Similarly, the regulations provide for the allocation of IFQ's to qualified persons in mandatory terms: "The Regional Director *shall* assign halibut or sablefish IFQs to each person holding unrestricted QS for halibut or sablefish, respectively, up to the limits prescribed at § 676.22(e) and (f)." *Id.* § 676.20(f) (emphasis added).

In that regard, we have been advised by the DOC that the fishermen identified in the notices of levy have satisfied all requirements to be classified as "qualified persons" by NMFS and are therefore entitled to be issued quota shares and the associated IFQ's.[5] In other contexts, it is recognized that an IRS levy attaches to all rights of the taxpayer which are fixed and determinable at the time of the levy, even though such rights have not been fully perfected or matured. *See St. Louis Union Trust Co. v. United States*, 617 F.2d 1293, 1302 (8th Cir. 1980) ("The unqualified contractual right to receive property is itself a property right subject to seizure by levy, even though the right to payment of the installments has not matured at the time of the levy."). Here, a qualified fisherman's right to be issued a quota share, as well as an associated IFQ, is recognized in the provisions of 50 C.F.R. § 676.20(a). The full extent of that right, to be determined on an annual basis when IFQ's are issued, need not be fixed with precision in order for it to fall within the coverage of § 6331.

Consequently, we conclude that the quota shares and IFQ's which the fishermen are entitled to receive under 50 C.F.R. § 676.20 constitute rights to property

---

[5] The NMFS regulations define a "qualified person" as follows:

> (1) *Qualified person.* As used in this section, a "qualified person" means a "person," as defined in § 676.11 of this part, that owned a vessel that made legal landings of halibut or sablefish, harvested with fixed gear, from any IFQ regulatory area in any QS qualifying year.

50 C.F.R. § 676.20(a)(1)(1994).

"belonging to" them within the meaning of § 6331(a). Absent a countervailing legal requirement, DOC/NMFS would therefore be obligated to comply with the IRS Notice of Levy.

## C. *Interference with the Statutory Fisheries Programs*

DOC's request for opinion suggests that the notices of levy at issue are legally invalid because they would unduly interfere with the performance of DOC's obligations under the Magnuson Act and the Halibut Act. As the DOC's letter states: "Although the IRS's novel collection action may be helpful in accomplishing its statutory goals, it is detrimental to our efforts to implement our own statutory mandate. We doubt that Congress intended such a result in enacting the authority cited by the IRS in this matter." DOC Ltr. at 4.

This contention calls into play the provisions of 26 U.S.C. § 6334(c), which state: "*Notwithstanding any other law of the United States* . . . no property or rights to property shall be exempt from levy other than the property specifically made exempt by subsection (a)." (emphasis added). Federal permits or licenses such as those at issue are not among the categories of property or property rights that are itemized and exempted from levy under § 6334(a). Moreover, courts have held that the list of exemptions enumerated in § 6334(c) is exclusive and definitive. *Sea-Land Service, Inc. v. United States*, 622 F. Supp. 769, 772–73 (D. N.J. 1985); *United States v. Offshore Logistics Int'l, Inc.*, 483 F. Supp. 1055, 1057 (W.D. La. 1979).

As noted above, the courts have recognized that the IRS's levy authority extends to property or entitlements that are held by federal government agencies. *United Sand and Gravel*, 624 F.2d at 736; *Simpson v. Thomas*, 271 F.2d 450, 452 (4th Cir. 1959). Thus, there is no implied exception from the levy authority for property, interests, or rights to property that are in the government's possession or control. Additionally, the legislative history of § 6334(c) indicates that Congress intended the IRS levy authority to prevail over other provisions of federal law in the case of conflicting provisions.[6] This view has been confirmed in court decisions. *E.g., Sea-Land*, 622 F. Supp. at 773; *Offshore Logistics*, 483 F. Supp. at 1056–57.

In any event, it is not evident that DOC's compliance with the levies at issue would significantly undercut the purposes and policies of the applicable federal fisheries statutes. The general purpose of those statutory schemes is to preserve the viability of the covered fish species and the health of dependent fishing indus-

---

[6] *See* H.R. Rep. No. 83–1337, at A409 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017, 4556, which states:

Subsection (c) of this section states that no property or rights to property, other than the properties specifically made exempt in this section, shall be exempt from levy by reason of any other law of the United States. . . . *[T]his subsection makes it clear that no other provision of Federal law shall exempt property from levy.*

(Emphasis added).

tries by maintaining limited and orderly fishing access. *See generally United States v. Cameron*, 888 F.2d 1279, 1280–81 (9th Cir. 1989) (Halibut Act); *Lovgren v. Byrne*, 787 F.2d 857, 861 (3d Cir. 1986) (Magnuson Act). If DOC surrenders the targeted quota shares and IFQ's in accordance with the levies, there is no reason to believe that any excessive take of the covered species will result, or that beneficial management of the halibut and sablefish fisheries will be significantly disrupted or impaired.

DOC's most specific contention regarding the adverse effect of the levies on the fisheries programs is the following: ''The Secretary of Commerce cannot manage fisheries in a responsible manner if one of our most effective techniques — allocating harvesting privileges by assignment of individual quotas — is compromised by our having to serve as a collection arm of the IRS.'' DOC Ltr. at 4.

Initially, an agency's compliance with a lawful federal tax levy does not, without more, render it a ''collection arm of the IRS.'' As shown by cases cited above, other departments and agencies have complied with such levies without apparent damage or compromise to their statutory mandates.

Moreover, the mere desire to avoid possible ''compromise'' of one regulatory approach chosen by an agency to comply with a general statutory mandate does not provide a justification for disregarding § 6334(c)'s provision that compliance with federal tax levies takes primacy over other statutory obligations.[7] Although DOC has not provided a detailed explanation of how compliance with the IRS levies would adversely affect its implementation of the relevant statutory requirements, it might be argued that one potential consequence would be some delay or disruption in the planned utilization of a small percentage of overall IFQ's.[8] This might conceivably have some marginal affect on the overall planned catch of the subject fisheries during this season. Even that prospect appears conjectural, however, inasmuch as quota shares and IFQ's levied by IRS and not reclaimed by the delinquent taxpayer would likely be sold to other qualified persons who would then utilize them. We do not consider such a conjectural and marginal disruption to the fishing quota systems to be of sufficient magnitude to override § 6334(c)'s provision that its levy requirements trump the provisions of other laws. No other adverse consequence that would provide a basis for a different conclusion has been demonstrated.

Given all the foregoing considerations, we find no persuasive basis for recognizing an implied exception from 26 U.S.C. § 6334(c)'s straightforward declaration

---

[7] Significantly, neither the Magnuson Act nor the Halibut Act *requires* DOC to utilize a quota share system in managing limited access to the protected fisheries. DOC has merely settled on that system as its chosen method of complying with the statutory requirements.

[8] According to the IRS submission, the approximately 300 fishermen-taxpayers affected by the levies represent only about 3.9% of the total applicant pool (about 7,600 applicants) for quota shares. IRS Ltr. at 18.

that all property is subject to IRS levy except those categories enumerated in sub-
section 6334(a).

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*