UNITED STATES of America, Plaintiff,

v.

Andrea A. RUFF, etc., Defendant.

No. 93–604–Civ–Orl–22.

United States District Court,
M.D. Florida,
Orlando Division.

Jan. 9, 1995.

Ralph E. Hopkins, U.S. Attorney's Office, Orlando, FL, Philip Doyle, U.S. Dept. of Justice, Tax Div., Washington, DC, for plaintiff.

Stephen G. Salley and Russell P. Hintze, Salley, Feinberg & Hames, P.A., Orlando, FL, for defendant.

### *ORDER*

CONWAY, District Judge.

This cause comes before the Court for decision on the parties' cross-motions for summary judgment. The parties agree that this case turns on the question whether the Defendant was in possession of property or

rights to property belonging to a third-party taxpayer on the date the Defendant was served by the Internal Revenue Service with a Notice of Levy. After carefully considering the motions, the Court determines that the question must be answered in the affirmative.

## I. FACTS[1]

At all times relevant to this dispute, the Defendant, attorney Andrea A. Ruff, served as Chapter 7 Trustee in the bankruptcy case *In re Central Micrographic Corporation d/b/a Hospital Cooperative Association,* case no. 88–2577–BKC–6S7, filed in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division. During the pendency of the bankruptcy case, Harold Gene Artrip approached Ruff and indicated that he had a prospective buyer of the bankruptcy debtor's assets. Consequently, on February 24, 1989, Ruff filed in the Bankruptcy Court an Application to employ Artrip as a business broker for the bankruptcy estate. On March 2, 1989, the Bankruptcy Court entered an Order granting the Application. The Order stated that Artrip would be "paid a commission only if his prospect is the successful buyer of the debtor's business in which case any awarded broker commission would be shared equally" with two other business brokers. The Order further stated that "a fee will only be paid upon application, general notice and approval of the Bankruptcy Court."

On April 17 and 18, 1989, an Agreement of Sale and Purchase of Real and Personal Property was executed regarding the bankruptcy estate.[2] The Agreement was signed by Ruff, as Trustee and as escrow agent, by the purchasers who had been introduced by Artrip, and by NCNB National Bank of Florida, which had liens on the debtor's assets. Paragraph 10.13 of the Agreement conditioned payment of brokers' commissions upon approval of the Bankruptcy Court.

On April 26, 1989, Artrip filed an Application for Allowance of Broker's Fee for Broker for the Trustee. At that time Artrip had completed all services for which he had been hired pursuant to the Bankruptcy Court's Order of March 2, 1989. Artrip sought a commission in the amount of $20,000.00.

On May 24, 1989, the Bankruptcy Court authorized the sale contemplated by the April 17 and 18, 1989 Agreement, by entering an Order on Motion by Trustee for Authorization to Sell Free and Clear of Liens Pursuant to 11 U.S.C. § 363(b) and (f). The sale was closed on June 16, 1989. Ruff retained proceeds from which the business brokers' commissions were to be paid.[3]

On July 13, 1989, the Bankruptcy Court set a hearing date of August 3, 1989, on Artrip's fee application. Ruff received the Notice before July 27, 1989.

On July 27, 1989, the IRS served Ruff with a Notice of Levy for Artrip's outstanding federal tax liabilities, which the IRS claimed exceeded $230,000.00. Ruff indicated on the reverse of the Notice of Levy that no funds were due. She also wrote "unknown" in response to the inquiry: "Next date you will owe funds to the taxpayer." The day Ruff was served with the Notice of Levy, Ruff, as Trustee, possessed sufficient funds to pay Artrip's commission.

On August 10, 1989, the Bankruptcy Court entered an Order granting Artrip's fee application. Specifically, the Order stated that compensation for Artrip was "set in the amount of $20,000.00 as a cost of administration to be paid by the trustee immediately." The next day, Ruff wrote Artrip a check for $20,000.00.

---

1. The relevant facts are not in dispute. Some of the facts set forth herein are derived from the "Statement of Admitted Facts" in the parties' Pretrial Statement (Dkt. 47).

2. In the "Statement of Admitted Facts" section of their Pretrial Statement, the parties have alternatively described this Agreement as being dated "April 16 and 17" and "April 17 and 18", 1989.

The former date appears to be a mistake, inasmuch as the document reflects that it was executed on April 17 and 18. Accordingly, the Court accepts the latter date as correct. In any event, the precise date the document was signed is immaterial for present purposes.

3. Part of the commissions was to be paid by NCNB, and part by the bankruptcy estate.

## II. RELEVANT TAX STATUTES

Title 26, United States Code, Section 6331(a) provides, in pertinent part, as follows:

Authority of Secretary.—If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary to collect such tax ... by levy upon all property and rights to property ... belonging to such person or on which there is a lien provided in this chapter for the payment of such tax.

Section 6332 of the Internal Revenue Code provides, in pertinent part, as follows:

(a) Requirement.—Except as otherwise provided in this section, any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights (or discharge such obligation) to the Secretary, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

\* \* \* \* \* \*

(d) Enforcement of levy.—

(1) Extent of personal liability.—Any person who fails or refuses to surrender any property or rights to property, subject to levy, upon demand by the Secretary, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or the rights not so surrendered, but not exceeding the amount of taxes for the collection of which such levy has been made, together with costs and interest on such sum at the underpayment rate established under section 6621 from the date of such levy..[.]

## III. THE PARTIES' POSITIONS

### A. Ruff's Position

Ruff argues that Artrip had no right to a broker's commission until final approval by the Bankruptcy Court. She focuses on the language of the Bankruptcy Court's Order appointing Artrip, stating that a "fee will only be paid upon application, general notice and approval of the Bankruptcy Court." Additionally, Ruff and her expert witness, bankruptcy attorney David R. McFarlin, have testified that it is unusual for a Bankruptcy Court in this District to grant interim fee applications made by or on behalf of professionals employed by a bankruptcy estate. Deposition of Andrea Ruff (Dkt. 32) at 32–34; Affidavit of David R. McFarlin (Dkt. 38) at para. 3. According to McFarlin, "it is the usual custom of Bankruptcy Courts to defer such applications until the assets of the particular bankruptcy estate have been liquidated and it has been determined what assets, if any, the bankruptcy estate possesses for purposes of paying fees to or on behalf of professionals employed by bankruptcy estates." Affidavit of David R. McFarlin at para. 3. Ruff has also testified that until the Bankruptcy Court enters an order allowing payment of a professional's fee, "there is no entitlement to be paid." Ruff deposition at 33. She maintains that the Bankruptcy Court has the ability to award nothing or something that bears no relationship to the original application. Ruff deposition at 34. Ruff says that because they "are totally at risk", many professionals will not work in the Bankruptcy Court "arena." Ruff deposition at 34.

Ruff also relies on 26 C.F.R. § 301.6331–1(a)(1), which states, in pertinent part:

[A] levy extends only to property possessed and obligations which exist at the time of the levy. Obligations exist when the liability of the obligor is fixed and determinable, although the right to receive payment thereof may be deferred until a later date.

Ruff contends that pursuant to this regulation, her obligation to pay Artrip his commission was not fixed and determinable until the Bankruptcy Court entered its Order approving Artrip's compensation.

Additionally, Ruff cites *In re Ceafco, Inc.*, 1977 WL 1273, 77–2 USTC P9760 (S.D.Ala. Sept. 21, 1977). In that case, the taxpayer was a creditor of the bankrupt and a claimant against the estate. The IRS served the bankruptcy trustee with a notice of levy demanding surrender of all property and rights

to property of the taxpayer in the trustee's possession. At the time the notice of levy was served, the bankruptcy court had not yet declared a dividend to creditors. The bankruptcy court held that since it had not yet determined how the assets of an estate in bankruptcy were to be distributed, the bankruptcy trustee did not have in his possession, at the time he was served with a notice of levy, any property or rights to property which belonged to a taxpayer.

In sum, Ruff argues that she did not possess any property or rights to property belonging to Artrip for the simple reason that Artrip's right to the commission had not yet come into being. As a result, she contends, she did not have any obligation to deliver Artrip's commission to the IRS when it was finally awarded by the Bankruptcy Court.

### B. The United States' Position

The United States contends that Artrip did have a property right in his commission at the time the Notice of Levy was served, even though he did not then have a present right to payment of the commission. The Government correctly notes that when the IRS served the Notice of Levy, Artrip had fully performed his brokerage services, and the transaction had closed. The United States contends that Artrip earned his commission upon closing, despite the fact that actual payment of the commission was conditioned on Bankruptcy Court approval.

The Government maintains that the Bankruptcy Court did not have unlimited discretion regarding approval of Artrip's fee. In that connection, the United States argues that since the Bankruptcy Court had previously approved the fee arrangement between Artrip and the bankruptcy estate, the Bankruptcy Code substantially limited the Bankruptcy Court's discretion as to final fee approval.

Finally, the Government cites binding former Fifth Circuit precedent for the proposition that a contingent interest is nevertheless a property right if it has some value, *Randall v. H. Nakashima & Co., Ltd.*, 542 F.2d 270 (5th Cir.1976) and *United States v. Hubbell*, 323 F.2d 197 (5th Cir.1963), and suggests that *Ceafco* was wrongly decided, in part because it ignored these precedents.

For these reasons, the United States maintains that at the time the IRS served Ruff with the Notice of Levy, she possessed property in which Artrip had an interest. Accordingly, Ruff was in constructive possession of Artrip's right, for the benefit of the IRS, with the result that she was obligated to pay the commission over to the IRS after the Bankruptcy Court approved payment to Artrip.

### IV. ANALYSIS

■ The pertinent analytical framework is set forth in *United States v. Metropolitan Life Ins.*, 874 F.2d 1497, 1500 (11th Cir.1989).

A court assessing a levy on a taxpayer's intangible interest in property held by third parties must determine first the nature of the taxpayer's interest in the property. This is a question of state law. Once the court has determined that a delinquent taxpayer has rights to the property, federal law determines whether the custodian of the property is obligated to surrender the property to the IRS.

(citing *United States v. National Bank of Commerce*, 472 U.S. 713, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985); other citation omitted). This Court must also be mindful that "Congress intended the IRS to be able 'to reach every interest in property a taxpayer might have.'" *Metropolitan Life*, 874 F.2d at 1500 (citing *National Bank of Commerce*, 472 U.S. at 720, 105 S.Ct. at 2924).

■ Under Florida law, "[a] property is deemed sold for commission purposes when the purchaser enters into a binding contract to purchase the property; however, the broker and the party paying the commission may establish conditions which must be met before the broker earns the commission." *Hagans Co. v. Manla*, 534 So.2d 750, 751–52 (Fla. 3d DCA 1988) (citations omitted). There is a distinction between conditions precedent to **entitlement** to a commission, and conditions precedent to **payment** of a commission. *See Harding Realty, Inc. v. Turnberry Towers Corp.*, 436 So.2d 983, 984 (Fla. 3d DCA 1983) (broker precluded from recovering commission where no closing took

place, since commission agreement "expresse[d] that entitlement to the commission, as opposed to just payment of the commission, [was] to occur at closing").

■ When the Notice of Levy was served on Ruff, Artrip had fully performed his services to the bankruptcy estate, his "prospect" had purchased the property, and the sale had closed. Under Florida law, Artrip had already "earned" his commission. Pursuant to the Agreement of Sale and Purchase of Real and Personal Property and the Bankruptcy Court's Order Granting Application to Employ Business Broker, the only remaining contingency was the Bankruptcy Court's approval of payment of the earned fee.

■ Ruff argues that the Bankruptcy Court had discretion to disallow or reduce Artrip's requested fee and that, accordingly, Ruff's obligation to pay a fee to Artrip was not fixed and determinable. The Court disagrees.

Ruff's application to employ Artrip as a business broker stated that despite Artrip's previous employment as an accountant for the bankruptcy estate, his employment as a business broker would not constitute a conflict of interest. The application further stated that two other business brokers had agreed to share their ten percent commission equally with Artrip if Artrip's "prospect" successfully purchased the debtor's business. The application asked the Bankruptcy Court to enter an Order employing Artrip as a business broker "to share in a third of the commission only in the event his buyer is the successful bidder." The Bankruptcy Court's Order granting Ruff's application approved this fee arrangement, with the *caveat* that Artrip would be paid a fee only upon application, general notice and approval of the Bankruptcy Court. Examination of relevant provisions of the Bankruptcy Code reveals that, under these circumstances, the Bankruptcy Court enjoyed only limited discretion in the matter of final fee approval.

Title 11, United States Code, Section 327(a) provides, in pertinent part, as follows:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

Section 328 of the Bankruptcy Code provides, in pertinent part, as follows:

(a) The trustee ..., with the court's approval, may employ or authorize the employment of a professional person under section 327 ... of this title ... on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. **Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.**

\*    \*    \*    \*    \*    \*

(c) [Subject to exceptions not here pertinent], **the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 ... of this title if, at any time during such professional person's employment under section 327 ... of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.**

(emphasis supplied).

Finally, Section 330(a) of the Bankruptcy Code provides, in pertinent part, as follows:

(a) After notice to any parties in interest and to the United States trustee and a hearing, **and subject to sections 326, 328, and 329 of this title,** the court may award to ... a professional person employed under section 327 ... of this title ...—

(1) reasonable compensation for actual, necessary services rendered by such ... professional person ..., based on the

nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and (2) reimbursement for actual, necessary expenses.

(emphasis supplied).

Under this statutory scheme, since the Bankruptcy Court had already approved the fee arrangement between Artrip and Ruff, it could reduce Artrip's requested fee only upon a finding that the original terms of employment were improvident in light of developments not capable of anticipation at the time of Artrip's employment. *See In re Reimers,* 972 F.2d 1127, 1128–29 (9th Cir. 1992); *In re Ross,* 94 B.R. 210, 215–16 (M.D.Ga.1988). There is absolutely no indication of any facts upon which the Bankruptcy Court could have based such a finding. Under the same statutes, the Bankruptcy Court could disallow Artrip's fee only upon a finding that Artrip was not a disinterested person, or that he held or represented an interest adverse to the estate. Again, there are no facts suggesting the Bankruptcy Court could have made such a finding. Indeed, in approving Artrip's employment, the Bankruptcy Court appears to have accepted Ruff's representation that such employment would not constitute a conflict of interest on Artrip's part.

In short, while payment of Artrip's fee was subject to the Bankruptcy Court's approval, that he would receive a fee could not seriously be questioned when Ruff was served with the levy. In fact, it was probable that Artrip would receive the amount he requested, particularly since he had reduced his commission from that which was initially approved by the Bankruptcy Court. Of course, the best support for these conclusions is that the Bankruptcy Court in fact approved payment of Artrip's commission in the very amount he sought.

Ruff also contends that the Bankruptcy Court's usual practice was to defer fee applications until resolution of the estate, in order to see whether there were remaining assets from which a fee could be paid. As a result, she suggests, Artrip might not have received any commission had there been insufficient assets remaining in the estate. The Court is unimpressed with this argument. First, the Bankruptcy Court had set a hearing on Artrip's fee application. Logically, that in itself was some indication that the Court was not deferring approval of Artrip's application. Second, to anticipate that there would be insufficient funds at the end of the case to pay Artrip's full commission, or even a reduced commission, would have been no more than an exercise in speculation.

In sum, Artrip had an enforceable, assignable property right in his commission at the time the levy was served on Ruff.

■ Once it has been determined that the taxpayer has a property right under state law, "the tax consequences thenceforth are dictated by federal law." *National Bank of Commerce,* 472 U.S. at 722, 105 S.Ct. at 2925 (citing *United States v. Bess,* 357 U.S. 51, 56–57, 78 S.Ct. 1054, 1057–1058, 2 L.Ed.2d 1135 (1958)). Hence, the remaining question is whether, under federal law, Artrip's earned but unpaid commission was "property or rights to property" subject to levy. Guidance is this matter is furnished by *United States v. Hubbell,* 323 F.2d 197 (5th Cir.1963) and *Randall v. H. Nakashima & Co., Ltd.,* 542 F.2d 270 (5th Cir.1976), the two former Fifth Circuit cases cited by the United States.

In *Hubbell,* the taxpayer was a painting subcontractor on a construction project. The prime contract required only one coat of paint. For reasons later determined to be arbitrary, the owner insisted that one coat was not sufficient. The taxpayer elected to finish the job, and applied another coat of paint at no extra cost. Due to problems encountered on the project, the taxpayer became insolvent. One of his debts consisted of withholding taxes owed the United States.

Prime contractors on the project sued the owner in state court, asserting, *inter alia,* a claim for the extra cost of painting. The contractors asked the taxpayer to join in the lawsuit as a plaintiff, but the taxpayer declined. After the IRS filed notices of tax liens against the taxpayer, the taxpayer assigned to the contractors 65% of taxpayer's anticipated net recovery against the owner.

The taxpayer was then added as a party to the state suit. The taxpayer and the contractors were awarded a money judgment against the owner on the "painting" claim. On appeal, the "painting" claim "was upheld as actionable economic coercion." *Hubbell,* 323 F.2d at 199. Pursuant to its agreement with the taxpayer, the contractors claimed 65% of the judgment; the United States claimed the entire judgment for satisfaction of its tax lien.

The owner filed an interpleader action, and paid the amount of the judgment into the registry of the district court. The district court held that the contractors' "claim against the judgment preceded the government's tax lien because [the taxpayer], against whose property the lien attached, 'acquired an interest in the suit solely by virtue of the [assignment] agreement ...,, which defines his proportional interest in any net recovery.'" *Hubbell,* 323 F.2d at 200.

The Fifth Circuit disagreed and reversed. The court stated that the contractors had "acquired an interest in [the taxpayer's] claim by virtue of [the assignment] agreement, not vice versa." *Id.* By that time, said the court, the tax lien had already attached to the taxpayer's claim against the owner. The court's analysis is instructive:

The controlling question ... is whether [the taxpayer's] right of action against [the owner] amounted to "property" or "rights to property" before he entered into the agreement with Contractors. [The contractors] argue that [the taxpayer] had only a "right to file suit" against the [owner], which may or may not have turned out to be a "right to property." [The United States] contends that the right of recovery of [the taxpayer], characterized as a claim sounding in tort by the Texas courts, was a "right to property" to which the lien attached.

State law controls in determining the nature of the legal interest which [the taxpayer] owned, but federal law controls the

consequences attaching thereto. [The taxpayer's] claim against [the owner] was a chose in action; the agreement with Contractors was an assignment of a portion of the chose in action; but the tax lien attached when the claim came into being (or as soon thereafter as the tax liens were perfected, such time being indisputably prior to the date of the assignment to Contractors). It must follow, therefore, that whatever rights Contractors took under the assignment were taken subject to the tax lien.

**[The taxpayer's] claim against [the owner] was not contingent merely because it would take a lawsuit to reduce it to judgment or to collect it. It was, perhaps, uncertain, but not subject to any infirmity which would prevent the attachment of the lien.** The real issue in this case, the unprecedented one, is whether the lien attaches to an unliquidated claim sounding in tort. Neither party cites us to a case directly in point, and we have found none. We see no reason, however, why a tort claim is not "property" or "rights to property", just as, e.g., any unliquidated contract claim is so considered.

*Id.* (citations omitted; emphasis supplied).

The question presented in *Nakashima,* 542 F.2d 270 (5th Cir.1976), was "whether the taxpayer, who conveyed his interest in [certain] equipment before he acquired legal title thereto under a partially executed contract, ever had 'property' or the 'right to property' such that [a] federal tax lien, filed prior to the conveyance, attached under Section 6321 of the Internal Revenue Code of 1954." *Randall v. H. Nakashima & Co., Ltd.,* 542 F.2d 270, 271 (5th Cir.1976) (footnotes omitted).[4] The Fifth Circuit answered the question in the affirmative, holding that "the taxpayer's rights in the partially executed contract were property or the right to property such that the federal tax lien attached before the taxpayer conveyed his contract rights."

**4.** *Nakashima* and *Hubbell* addressed the question whether a taxpayer had property or rights to property for the purpose of determining whether a tax lien had attached. The issue in the instant case is whether the taxpayer had property or rights to property requiring surrender to the IRS upon levy pursuant to 26 U.S.C. § 6332. Since Sections 6331(a) and 6332(a) of the Internal Revenue Code both contain the words "property" and "rights to property", the Court believes that the reasoning of *Nakashima* and *Hubbell* applies equally to this case.

*Id.* at 275. Central to this holding was the Fifth Circuit's conclusion that the taxpayer's contingent right to the proceeds of his partially executed contract was "worth something", that it had "a presently realizable value." *Id.* at 274. The court's reasoning illustrates the breadth, for federal tax purposes, of "property" and "rights to property":

> In holding that the taxpayer's contract right was property or a property right for purposes of 26 U.S.C. § 6321, we recognize that property is an expanding concept. Modern commercial transactions have spawned species of rights that the common law of years anon could not have envisaged. The era of [seisin] and tail has long vanished. Puts and calls, hedges and options are, analytically, property insofar as their possessor may realize something from their transfer. "Property" is not to be confined in a juridical straitjacket.
>
> \*   \*   \*   \*   \*   \*
>
> The drafters of ... § 6321 were wise in using the words "property ... or rights to property" instead of enumerating attributes or varieties of property rights. By this device they allowed the words that expansiveness, flexibility, and potential for growth with which our commercial world endows them in the marts of trade. A contingency that conditions acquisition of legal title does not render empty or valueless a contract right in the property sought to be acquired. The concept of property is not bound to the present. Congress, in enacting § 6321, knew that the forms and varieties of property would remain in flux, and that a definition capable of precisely capturing those valuable interests for the tax gatherers' harvest would elude it.
>
> Congress did not attempt to define the commercial cosmos. Rather, it was perfectly willing to let contemporary transactions be analyzed to determine whether or [not] the delinquent taxpayer had any part of a bundle of rights of commercial value, to which the tax lien would then attach. In ancient days, the acquisition or alienation of property was governed by a formalism that marked by seal and solemnity the passing of title. In our own day, the electronic impulse must substitute for a handshake and a computer print-out for a seal. We locate property not through the nomenclature of title, but through the realities of the marketplace. **The pertinent question in this case is, "was the interest of the taxpayer in the [equipment] bargainable, was it transferable, did it have value?"** We answer in the affirmative.

*Id.* at 277–78 (emphasis supplied).

In light of *Hubbell* and *Nakashima*, the Court has no doubt that Artrip's right to a commission was "property or rights to property" within the meaning of 26 U.S.C. § 6332(a). Artrip's interest in the commission had value; it was bargainable and transferable. It was no more contingent or "uncertain" than the interests at issue in *Hubbell* and *Nakashima*. Moreover, the Court concurs in the United States' assessment of *In re Ceafco*, 1977 WL 1273, 77–2 USTC P9760 (S.D.Ala. Sept. 21, 1977). *Ceafco* appears to have been wrongly decided, inasmuch as it seemingly conflicts with the reasoning underpinning *Hubbell* and *Nakashima*.

## V. CONCLUSION

On July 27, 1989, by means of the Notice of Levy it served on Ruff, the United States came into constructive possession of Artrip's right to receive a $20,000.00 commission from the bankruptcy estate. When the Bankruptcy Court awarded Artrip his commission, Ruff should have paid the $20,000.00 to the IRS. Her failure to do so renders her personally liable, pursuant to 26 U.S.C. § 6332(d)(1), for the entire amount that could have been collected under the levy.

Based on the foregoing, it is ORDERED as follows:

1. Defendant's Motion for Summary Judgment (Dkt. 34), filed August 29, 1994, is DENIED.

2. Plaintiff's Motion for Summary Judgment (Dkt. 30), filed August 26, 1994, is GRANTED.

3. The Clerk shall enter final judgment in favor of Plaintiff, United States of America,

and against Defendant, Andrea A. Ruff, in the amount of $20,000.00.[5]

4. This case is removed from the February 1995 trial calendar.

---

**5.** The United States' Complaint (Dkt. 1) sought, in addition to the $20,000.00, interest pursuant to 26 U.S.C. § 6621. However, the parties' Pretrial Statement (Dkt. 47) makes no mention of interest as an element of damages. Rather, the Government's statement of its case states only that by failing to honor the levy, Ruff "became liable to the United States pursuant to 26 U.S.C. Section 6332(d)(1) in the amount that could have been collected by way of the levy, $20,000.00."

Pretrial Statement at 2. Local Rule 3.06(c)(7) requires that a pretrial statement contain "in cases in which any party claims money damages, a statement of the elements of each such claim and the amount being sought with respect to each such element." Since the Pretrial Statement is silent on the subject, it appears that the United States' entitlement to statutory prejudgment interest is no longer an issue in this case.