**Jacklyn TULL; James C. Tull,**
**Plaintiffs–Appellants,**

v.

**UNITED STATES of America,**
**Defendant–Appellee.**

**No. 94–15562.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 20, 1995.

Decided Nov. 7, 1995.

nal Revenue Service to the payment of the corporation's trust fund obligations, rather than to other corporate tax obligations. We agree with Tull and reverse and remand for further proceedings.

Stephen M. Moskowitz, San Francisco, California, for plaintiffs-appellants.

Gary R. Allen, Randolph L. Hutter and William S. Estabrook, Tax Division, United States Department of Justice, Washington, D.C., and Charles Stevens, Assistant United States Attorney, Sacramento, California, for defendant-appellee.

Before: SNEED, PREGERSON, and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Jacklyn Tull[1] appeals from the district court's judgment[2] in favor of the United States in which the court determined that she was responsible for the failure to pay over taxes withheld from employees' wages by Hatfield Trucking Service, Inc. The sole issue is Tull's contention that the district court erred when it determined that Hatfield did not have the ability to direct that a check for auction proceeds be applied by the Inter-

## BACKGROUND

Tull was the Secretary and Treasurer of Hatfield. It began experiencing financial difficulties and failed to pay a portion of its federal payroll tax liability for each of the first three quarters of 1989. Because of its financial problems, Hatfield decided to sell some of its assets at auction. Thus, on November 22, 1989, it entered into an auction agreement with Western 11 Auctions. Tull advised the IRS of the proposed auction, and on January 8, 1990, the IRS served a notice of levy on Western with respect to Hatfield's payroll tax liabilities for the first two quarters of 1989. Pursuant to the auction agreement, the auction took place on January 18, 1990. On or about that same day, the IRS assessed a 100 percent penalty[3] against Tull for the allegedly unpaid trust fund portions of Hatfield's payroll tax liabilities for the first three quarters of 1989.

The auction agreement stated that Hatfield had employed Western, and "in consideration of [Western's] efforts to sell the property hereafter described" it gave Western "the sole and exclusive right to offer for sale and to sell the property described in Schedule A annexed to and incorporated in this agreement, at public auction, according to the terms and conditions set out herein." However, no Schedule A was appended to the agreement.

Under the terms of the agreement, Western was to receive a ten percent commission on all properties sold at the auction. The agreement also provided that Western was required to: (1) prepare and distribute a catalog of Hatfield's property prior to the auction sale; (2) advertise the auction sale according to the custom and usage of the

1. James C. Tull, the husband of Jacklyn Tull, also appeals. However, because the issues in this case relate to her actions, we will hereafter refer only to her unless otherwise stated.

2. *Tull v. United States,* 848 F.Supp. 1466 (E.D.Cal.1994) *("Tull I ").*

3. The penalty was assessed pursuant to 26 U.S.C. § 6672(a).

business; (3) furnish to Hatfield a list of Hatfield's property within 15 days of the auction sale; and (4) cause the buyer to sign, immediately after the sale is consummated, a "memorandum of sale" and collect the purchase price in cash, certified check, or other form of payment agreeable to Western, Hatfield, and the buyer. Finally, the agreement provided that Hatfield could not withdraw its property prior to the auction sale without Western's prior written consent, a provision honored in the breach.

At least one month prior to the auction, Hatfield provided Western with a basic equipment list. Hatfield and Western then marked up the list in order to identify the items that were to be sold at the auction. Both parties understood that Hatfield intended to offer a majority of its trucking equipment for sale at the auction. However, notwithstanding the written agreement's contrary provision, John Hatfield, president of the corporation, and Western orally agreed that Mr. Hatfield could remove equipment from the auction yard (Hatfield's place of business) and could use, keep or sell that equipment himself. Mr. Hatfield was removing equipment up to a day or two before the auction.

About three weeks before the auction, Western circulated, at its own expense, an advertising brochure, which was based on the equipment list and which set forth some items to be sold. The brochure also included a number of other items, such as office and shop equipment, which were not on the equipment list but which were ultimately offered for sale. Moreover, the brochure did not list all of the items that were eventually offered for sale and listed some items that were not ultimately offered for sale, including certain truck trailers. The specific items to be sold at the auction were not identified until Western prepared the final lot list one or two days prior to the auction. About two weeks before the auction date, Western had paid a company to clean many of the trucks, which it expected to sell.

On February 12, 1990, a Western representative delivered to Hatfield a check in the amount of $111,152.92. The check was payable jointly to Hatfield and the IRS. While the Western representative was present, Tull designated on the face of the check that the money should be applied against the trust fund portion of Hatfield's second and third quarter federal payroll tax liabilities. Tull then told the Western representative that she would deliver the check to the IRS, but the representative offered to deliver the check for her. Tull agreed. The IRS refused to accept the check because it considered the designation to trust fund tax liabilities to be invalid. In its view, the payment was involuntary because it was subject to the IRS's levy against Western. Following the IRS's instructions, Western subsequently issued a new check in the amount of $94,772.90 payable to the IRS and sent the balance of the proceeds to the California Employment Development Department, which had asserted a prior lien in the amount of $16,380.02. The IRS then applied the auction payment to Hatfield's non-trust fund liabilities.

A portion of the assessed penalty was collected from Tull, and she thereafter filed this action for a refund; the government answered and filed a counterclaim for the unpaid portion of the assessment. The district court ultimately entered judgment for the government, and this appeal ensued.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1346(a)(1), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

■ Whether the IRS levy attached to fixed and determinable rights is a question of law which we review *de novo*. *See United States v. Hemmen*, 51 F.3d 883, 886 (9th Cir.1995); *King v. Franchise Tax Board*, 961 F.2d 1423, 1424 (9th Cir.1992).

## DISCUSSION

■ When a taxpayer like Hatfield makes a voluntary tax payment, it can direct that the payment be applied to a particular tax liability rather than to another one. *See In re Technical Knockout Graphics, Inc.*, 833 F.2d 797, 799 (9th Cir.1987); *see also Slodov v. United States*, 436 U.S. 238, 253 n. 15, 98 S.Ct. 1778, 1788 n. 15, 56 L.Ed.2d 251 (1978).

The parties do not dispute that. "However, where the payment is 'involuntary,' the IRS allocates the payments as it sees fit...." *Technical Knockout,* 833 F.2d at 799. What it usually sees fit to do is what it did here; it applies the payment to non-trust fund taxes. It, thus, maximizes its collection abilities because it can seek payment of the trust fund taxes from others, like Tull. An involuntary payment is " 'one made pursuant to judicial action or some form of administrative seizure, like a levy.' " *Id.* at 802 (citation omitted). The administrative action attempted here was a levy. If that levy were valid, the IRS obtained the auction proceeds by involuntary means and properly applied those proceeds. We hold, however, that the levy was invalid.

■ When the IRS seeks to collect taxes by means of a levy, it must adhere to the provisions of the Internal Revenue Code. As pertinent here, that Code provides:

(a) If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property ... belonging to such person or on which there is a lien provided in this chapter for the payment of such tax.

. . . .

(b) The term "levy" as used in this title includes the power of distraint and seizure by any means. Except as otherwise provided in subsection (e) [salary or wage levies], a levy shall extend only to property possessed and obligations existing at the time thereof.

26 U.S.C. § 6331(a) and (b). The Treasury regulations further delineate the limits of the levy power by providing that:

If any person liable to pay any tax neglects or refuses to pay the tax within ten days after notice and demand, the district director to whom the assessment is charged ... may proceed to collect the tax by levy.... Except as provided in § 301.6331–1(b)(1) with regard to a levy on salary or wages, a levy extends only to property possessed and obligations which

exist at the time of the levy. Obligations exist when the liability of the obligor is fixed and determinable although the right to receive payment thereof may be deferred until a later date.

26 C.F.R. § 301.6331–1(a)(1).

■ On appeal, the parties do not seem to dispute the district court's determination that Hatfield's contract with Western could be designated as some kind of an enforceable interest under state law. *See Tull I,* 848 F.Supp. at 1475–77. That determination is necessary to the validity of the levy on the auction proceeds, though it is not sufficient. *See United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985). As the regulations point out, the liability of Western to Hatfield had to be "fixed and determinable" at the time of the levy. 26 C.F.R. § 301.6331–1(a)(1). The government asserts that the rights in question were fixed and determinable because Western had an obligation to attempt to sell some as yet undetermined amount of property for an as yet undetermined price to as yet undetermined buyers. We do not see how the words "fixed and determinable" can be given so unfixed and undetermined a meaning. The examples in the Treasury regulations confirm our understanding about the meaning of those words. The examples are as follows:

For example, if on the first day of the month a delinquent taxpayer sold personal property subject to an agreement that the buyer remit the purchase price on the last day of the month, a levy made on the buyer on the 10th day of the month would reach the amount due on the sale, although the buyer need not satisfy the levy by paying over the amount to the district director until the last day of the month. Similarly, a levy only reaches property in the possession of the person levied upon at the time the levy is made together with interest that accrues during the 21–day holding period provided for in § 6332(c). For example, a levy made on a bank with respect to the account of a delinquent taxpayer is satisfied if the bank surrenders the amount of the taxpayer's balance at

the time the levy is made. The levy has no effect upon any subsequent deposit made in the bank by the taxpayer. Subsequent deposits may be reached only by a subsequent levy on the bank.

*Id.* While these examples are not directly on point, they are redolent with meaning both in what they do say and in what they do not say. An actual sale of property would establish both the price of that property and the duty of the buyer to pay the price, even if the date of payment were deferred. On the other hand, if a prospective buyer had not yet agreed to pay anything and was only thinking about whether he would buy at all, it could hardly be argued that the possible ultimate payment was property of the prospective seller. If the buyer did later agree to purchase at a certain price, a new levy would reach that amount, just as it would reach a later deposit in a bank. But to call an obligation both fixed and determinable when there has been no sale at all, no prospective buyer, no final determination of what will be sold, and no notion of the price is to strip the words "fixed and determinable" of all meaning. Western was simply an agent for the purpose of attempting a sale of Hatfield's property. That did not establish any fixed and determinable obligation regarding possible proceeds.

The district court put great weight on the fact that the contract was not entirely executory because some performance had taken place under it. We do not see how that gave rise to any fixed and determinable right to any funds. Wholly executory or not, Western did not actually hold anything for Hatfield until it auctioned the property. Had the IRS levied after the property was auctioned, we would have a different case. As it was, the IRS tried to levy on funds that might come to Western from as yet unobligated buyers before the funds even existed. In that respect the IRS was just as unsuccessful as it would have been had it levied on a bank account before funds were deposited. The fact that the bank already had obligations as to any funds that might be deposited, as banks usually do, would not give rise

to any fixed and determinable right regarding undeposited funds.

Other courts have reached similar conclusions. Thus, in *In re Hawn*, 149 B.R. 450 (Bankr.S.D.Tex.1993), the court determined that an IRS levy "will *not* reach amounts to be received in the future for sales of property that have not yet occurred." *Id.* at 457. Similarly, in *United States v. Morey*, 821 F.Supp. 1438 (W.D.Okla.1993), the court held that "for purposes of enforcing a levy, one must be able to fix and determine the value of the taxpayer's property interest on the date of levy in order for there to be property subject to levy in the hands of the obligor." *Id.* at 1442; *cf. United States v. Murray*, 640 F.Supp. 89, 90 (E.D.Tenn.1986).

Nor is our conclusion contrary to *Seaboard Surety Co. v. United States*, 306 F.2d 855 (9th Cir.1962), upon which the district court relied. That case dealt with tax liens upon the taxpayer itself, and it is clear that liens attached to current property of the taxpayer and "to all after-acquired property of the taxpayer." *Id.* at 859. Levies, however, do not affect after-acquired property. Indeed, it is interesting to note that in *Seaboard*, the IRS did not levy until proceeds actually owed to the taxpayer were in the hands of the persons levied upon. *Id.* at 857.

More to the point is *Hemmen*, where the performance of the taxpayer had been completed and the amount he was owed for that performance had been determined, subject to a possible later defeasance in whole or part if funds were not available. 51 F.3d at 890. We decided that because the amount that the taxpayer would ultimately receive was "capable of precise measurement in the future," it was determinable. *Id.* The right to payment and the amount that would be taken into account in calculating that payment was known, so we held that the levy was valid. Of course, that is a far cry from this case where neither the full extent of the property to be sold, nor the fact of sale, nor the proceeds were known, and nothing at all was in the hands of Western. But even *Hemmen*, a case where the rights of the taxpayer

were much more fixed and determined, elicited a vigorous dissent. *Id.* at 892–94 (Kleinfeld, J., dissenting). Therefore, nothing in our prior cases undercuts or conflicts with our determination in this one.

## CONCLUSION

Speed and efficiency are usually desiderata of good government, but there are times when precision is required also. It is not useful to levy upon a taxpayer's creditor after the creditor has relinquished the funds. It also is not useful to levy before the creditor has the funds. An error on either side renders the levy ineffective. So it was here. The IRS, in effect, attempted to levy upon sale proceeds before there was any sale at all. Even though there was a contract to attempt the sale, the levy came too soon and was invalid. As a result, the taxpayer, Hatfield, did properly direct that the auction proceeds be applied to the trust fund obligation. The IRS should have so applied them.

Therefore, on the issue presented we must reverse and remand this case to the district court as to both Jacklyn Tull and James C. Tull. The district court can then determine what amount is now owed to which party and can enter judgment accordingly.[4]

REVERSED and REMANDED.

---

4. Tull seeks attorneys fees on appeal pursuant to 28 U.S.C. § 2412(d). However, that section does not apply to this tax litigation. *See* 28 U.S.C. § 2412(e). She also seeks attorneys fees on appeal pursuant to 26 U.S.C. § 7430, but we can by no means determine that the position of the United States on the arcane question at issue here was not substantially justified. Thus, we deny the requested fee award.