United States Court of Appeals,

Eleventh Circuit.

No. 95-2665.

UNITED STATES of America, Plaintiff-Appellee,

v.

Andrea A. RUFF, individually and as Trustee for the bankruptcy estate of Central Micrographic Corporation d/b/a Hospital Cooperative Assn., Defendant-Appellant.

Nov. 21, 1996.

Appeal from the United States District Court for the Middle District of Florida. (No. 93-604-CIV-ORL-22), Anne C. Conway, Judge.

Before HATCHETT, Chief Judge, ANDERSON, Circuit Judge, and WOOD[*], Senior Circuit Judge.

ANDERSON, Circuit Judge:

Defendant-appellant Andrea A. Ruff appeals the judgment of the district court, on summary judgment, in favor of plaintiff-appellee the United States of America in the amount of $20,000, arising from Ruff's failure to honor an Internal Revenue Service ("IRS") levy on property or rights to property of a delinquent taxpayer in her possession. *United States v. Andrea A. Ruff,* 179 B.R. 967 (M.D.Fla.1995). Because we find that judgment was properly awarded to the government, we affirm.

I. STATEMENT OF THE CASE

*A. Facts*[1]

The facts in this case are not in dispute. At all times

_____

[*]Honorable Harlington Wood, Senior U.S. Circuit Judge, Seventh Circuit, sitting by designation.

[1]Our statement of the facts is taken in large measure (verbatim in considerable part) from the district court's excellent opinion.

relevant to this controversy, Ruff served as the Chapter 7 Trustee in the bankruptcy case *In re Central Micrographic Corporation d/b/a Hospital Cooperative Association,* case no. 88-2577-BKC-6S7, filed in the United States Bankruptcy Court for the Middle District of Florida. During the pendency of the bankruptcy case, Harold Gene Artrip approached Ruff and informed her that he had a prospective buyer for the debtor's assets. On February 24, 1989, Ruff filed an application with the bankruptcy court to employ Artrip as a business broker for the bankruptcy estate, under which he would receive a 10% commission to be shared by Artrip and two other brokers previously employed by the estate. On March 2, 1989, the bankruptcy court entered an order granting that application. The order stated that the commission would be paid "only if his prospect is the successful buyer of the debtor's business, in which case any awarded broker commission would be shared equally" with the two other brokers. The order also stated that payment of the commission was subject to final approval by the bankruptcy court.

On April 17 and 18, 1989, Ruff, on behalf of the bankruptcy estate, entered into an Agreement of Sale and Purchase of Real and Personal Property with the prospective purchasers identified by Artrip. The agreement was signed by Ruff, as trustee for the estate, by the purchasers, and by NCNB National Bank of Florida, which held liens on the debtor's assets. The property thus sold was that property for which Ruff had employed Artrip as a business broker. On April 26, 1989, Artrip filed an Application for Allowance of Broker's Fee for Broker for the Trustee. The parties agree that at the time he filed this application, Artrip had

completed all of the services for which he was hired pursuant to the bankruptcy court's March 2 order. Artrip sought $20,000, which represented one-third of the broker's fee derived from the sale of the bankruptcy estate's assets, consistent with the March 2 order. He noted in the application that if the sale to his prospects were not consummated, he was not entitled to the commission. On May 24, 1989, the bankruptcy court authorized the sale contemplated by the April 17 and 18 agreement. The closing of that sale occurred on June 16, 1989.

On July 13, 1989, the bankruptcy court entered a Notice of Hearing, setting August 3, 1989, as the date for the hearing on Artrip's fee application. Ruff received this notice before July 27, 1989. Prior to the events discussed above, the IRS assessed a federal tax liability against Artrip, pursuant to 26 U.S.C. § 6672. On July 27, 1989, the IRS served on Ruff a Notice of Levy for Artrip's outstanding tax liabilities, which the Service indicated exceeded $230,000. The levy sought,

> [a]ll property, rights to property, money, credits, and bank deposits now in your possession and belonging to this taxpayer (or for which you are obligated), and all money or obligations you owe this taxpayer....

Ruff indicated on the reverse of the Notice of Levy that she held no funds due Artrip. In response to the question on that same form asking when Ruff would next owe Artrip money, Ruff wrote "unknown." On the day that Ruff received the Notice of Levy, she possessed, as Trustee in the Central Micrographics case, funds sufficient to pay Artrip's commission.

On August 10, 1989, the bankruptcy court entered an order granting Artrip's application for fees in the amount of $20,000,

thus authorizing payment thereof.  On August 11, Ruff, acting as Trustee for the bankruptcy estate, executed a check payable to Artrip in the amount of $20,000 for his share of the commission derived from the sale of the assets of Central Micrographics.

*B. Issue on appeal*

26 U.S.C. § 6332(a) requires that "any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights to property" to the Secretary.  26 U.S.C. § 6332(d)(1) provides that any person who fails to surrender property subject to levy shall be held personally liable for the value of the property not surrendered. The sole issue in this case is whether Ruff was "in possession of (or obligated with respect to) property or rights to property subject to levy," meaning in this case any property or rights to property belonging to Artrip, at the time she received the Notice of Levy from the IRS on July 27, 1989.

## II. ANALYSIS

*A. Standard of review*

We review the district court's grant of summary judgment *de novo, Hutton v. Strickland,* 919 F.2d 1531, 1536 (11th Cir.1990), viewing the facts in the light most favorable to the non-movant. *N.A.A.C.P. v. Hunt,* 891 F.2d 1555, 1559-60 (11th Cir.1990).

*B. Discussion*

The IRS is empowered to levy on the property or rights to property of a delinquent taxpayer in the hands of a third party pursuant to 26 U.S.C. § 6331(a).  The levy itself does not

determine whether the government's claim is superior to those of other claimants. Instead, the levy power is designed to enable the government "promptly to secure its revenues" while competing claims are resolved. *United States v. National Bank of Commerce,* 472 U.S. 713, 721, 728, 105 S.Ct. 2919, 2924, 2928, 86 L.Ed.2d 565 (1985). Upon receipt of a notice of levy, such third parties are required to surrender that property to the IRS. 26 U.S.C. § 6332(a). The notice of levy "gives the IRS the right to all property levied upon ... and creates a custodial relationship between the person holding the property and the IRS so that the property comes into constructive possession of the Government." *National Bank of Commerce,* 472 U.S. at 720, 105 S.Ct. at 2924. Those individuals who fail to honor the Service's levy incur liability to the government equal to the full value of the property not surrendered. 26 U.S.C. § 6332(d)(1); *United States v. Metropolitan Life Ins.,* 874 F.2d 1497, 1499 (11th Cir.1989).

A third party may raise only two defenses to excuse its failure to surrender levied property to the government. First, it can show that it was not, pursuant to the language in 26 U.S.C. § 6332(a), "in possession of" any of the delinquent taxpayer's property or rights to property at the time that it received the notice of levy. *National Bank of Commerce,* 472 U.S. at 722, 105 S.Ct. at 2925; *Metropolitan Life,* 874 F.2d at 1499. Second, it can show that when it received the notice of levy, the property in question was subject to attachment or execution under judicial process. *National Bank of Commerce,* 472 U.S. at 722, 105 S.Ct. at 2925; *Metropolitan Life,* 874 F.2d at 1499. Ruff raises only the

first of these defenses.

Ruff argues that she was not "in possession of" any of Artrip's property or rights to property on July 27, 1989, the day on which she received the Notice of Levy. In order to determine if Ruff was in possession of Artrip's property, specifically the $20,000 commission he eventually received as compensation for his services as a business broker in the Central Micrographics sale, we employ a two-step analysis.

> A court assessing a levy on a taxpayer's intangible interest in property held by third parties must determine first the nature of the taxpayer's interest in the property. This is a question of state law.... Once the court has determined that a delinquent taxpayer has rights to property, federal law determines whether the custodian of the property is obligated to surrender the property to the IRS.

*Metropolitan Life,* 874 F.2d at 1500 (citing *National Bank of Commerce,* 472 U.S. at 724 n. 8, 105 S.Ct. at 2926 n. 8).

*1. Artrip's right to property under Florida law*

Under Florida law, a property has been sold, for the purpose of establishing entitlement to a commission, once the purchaser executes a binding contract to purchase the property at issue. *Hagans Co. v. Manla,* 534 So.2d 750, 751 (Fla. 3d DCA 1988). However, the broker and the party responsible for payment of the commission may record in the broker's commission agreement express conditions precedent to the broker's entitlement to that commission, and these conditions must be met before the broker is legally entitled to payment. *Id.* at 751-52; *Harding Realty, Inc. v. Turnberry Towers Corp.,* 436 So.2d 983, 984 (Fla. 3d DCA 1983). Significantly, there is a distinction under Florida law between a condition precedent to the entitlement to a commission and a

condition precedent to the payment of a commission. *See Harding Realty,* 436 So.2d at 984 (broker was not entitled to commission because commission agreement "expresse[d] that entitlement to the commission, as opposed to just payment of the commission, [was] to occur at closing," and closing never occurred).

On April 17 and 18, 1989, Ruff, on behalf of the bankruptcy estate, entered into a binding contract of sale for the assets of the estate to the prospect identified by Artrip. The sale was approved by the bankruptcy court, and was consummated. However, Ruff argues that Artrip's appointment by the bankruptcy court as a business broker and the commission agreement were subject to an express condition precedent to his entitlement to the commission. That order states:

> [A] fee will only be paid upon application, general notice and approval of the Bankruptcy Court.

*In re Central Micrographic Corp.,* No. 88-2577-BKC-6S7 (Bankr.M.D.Fla. March 2, 1989) (Order appointing Artrip business broker). Ruff argues that Artrip was not entitled to those fees until the bankruptcy court gave its final approval, which occurred on August 10, 1989.

As noted above, there is a difference under Florida law between entitlement to a commission and payment of a commission. The broker in *Harding Realty* was denied his commission because the commission agreement specifically stated that entitlement to the commission would occur at closing, and the buyers never closed on the properties. *Harding Realty,* 436 So.2d at 984. In this case, Artrip's commission was agreed upon and approved on March 2, 1989, by the bankruptcy court. Under that order, Artrip was entitled to

the commission if his prospect was the successful buyer of the property, which was in fact the case. It is true that the order also stated that Artrip's commission would be "paid" only upon subsequent application to and approval by the bankruptcy court. The court's order conditioned *payment,* not *entitlement,* upon further approval. Under Florida law, the condition as to payment did not undermine Artrip's entitlement. Thus, Artrip was entitled to payment, at the latest, when the sale of the property was consummated pursuant to the April 17 and 18, 1989, contract for sale. *Hagans Co.,* 534 So.2d at 751. The district court properly concluded that, under Florida law, Artrip had an entitlement, and thus had a property interest in the commission.

*2. Ruff's obligation to surrender Artrip's commission to the IRS*

Once it is determined that a state law property interest exists, Federal law determines the tax consequences of that interest. *National Bank of Commerce,* 472 U.S. at 722, 105 S.Ct. at 2925. State law is not relevant to this inquiry. *Id.* Federal law, specifically the Treasury regulations governing the levy power, establishes the nature of this determination.

> [A] levy extends only to property possessed and obligations which exist at the time of the levy. Obligations exist when the liability of the obligor is fixed and determinable although the right to receive payment thereof may be deferred until a later date.

26 C.F.R. § 301.6331-1(a)(1). The issue of whether Ruff was obligated to surrender Artrip's commission to the IRS is really a question of whether the liability of the bankruptcy estate to Artrip was "fixed and determinable" at the time that the Notice of Levy was served on Ruff. *United States v. Hemmen,* 51 F.3d 883, 888

(9th Cir.1995).

At the outset, it is important to note that the quoted regulations include among obligations which are "fixed and determinable" those obligations for which the right to receive payment has been deferred. Thus, an obligation can be fixed and determinable even if the right to receive payment does not arise until a later time. The court in *Hemmen* analogized a fixed and determinable obligation of this type to "an ordinary contract with an executory duty to pay for a completed performance by the obligee." *Id.* at 890.

The situation confronted by the court in *Hemmen* is very similar to that in the case at bar. In *Hemmen,* the president of a Chapter 11 debtor, Al-Hadid (hereinafter referred to as taxpayer) performed certain services for the estate by working to preserve the assets of the estate. He filed a claim with the bankruptcy court for administrative expenses. The case was converted into a Chapter 7 liquidation, and Hemmen was appointed trustee. *Id*. at 886. The district court entered two separate orders allowing the taxpayer's claim for administrative expenses. The second of these orders, dated October 16, 1984, indicated that payment would not be made "except upon further order of the court." *Id.* The underlying performance by the taxpayer was complete at all relevant times. Approximately one year before the issuance of these orders, the IRS assessed a civil tax penalty against the taxpayer. Pursuant to that assessment, on December 17, 1985, after allowance of the claim for administrative expenses but before the bankruptcy court had finally approved payment thereof, IRS agents served a notice of

levy on Hemmen demanding the surrender of any of the taxpayer's property or rights to property in Hemmen's possession as a result of his status as trustee. *Id.* However, instead of surrendering the money owed by the estate to the taxpayer, Hemmen paid those funds to the taxpayer. The IRS sued Hemmen, arguing that he was personally liable for the funds paid to the taxpayer.

The court in *Hemmen* held that the allowed administrative expenses were fixed and determinable as of the date on which the Secretary's notice of levy was served. It reached this conclusion despite the fact that actual payment of those expenses by the trustee had to await authorization from the bankruptcy court, and the fact that the claims for expenses could be reduced to money only if there were sufficient assets left in the estate to satisfy them. *Id.* at 890. Additionally, the court noted that the trustee retained the power to move the bankruptcy court to disallow the claims. *Id.* These factors failed to sway the court.

> None of these conditions to payment, however, undermines the proposition that the obligation of the estate to [the taxpayer] was "fixed" within the meaning of § 301.6331-1(a)(1) after the underlying performance was completed and the claim was allowed by the court.... At best, the factors Hemmen cites establish only that the estate's liability was fixed but that [the taxpayer's] interest was still subject to possible defeasance due to factors having no bearing on the underlying performance.

*Id.* Further, the court held that the sum due the taxpayer was determinable because, although there was some uncertainty as to whether there would be sufficient funds remaining in the estate to pay the taxpayer's claims, the sums were still capable of precise measurement in the future. *Id.* (citing *Reiling v. United States,* 77-1 U.S. Tax Cas. (CCH) P9269, 1977 WL 1094 (N.D.Ind.1977)).

Thus, according to the *Hemmen* court, the administrative expenses due the taxpayer were fixed and determinable because they had been allowed by the bankruptcy court and the underlying performance had been completed. The fact that payment might not be made due to a shortfall in the estate or subsequent disallowance by the bankruptcy court had no impact on the *Hemmen* court's determination that they were fixed and determinable as of the date of the levy.

Similarly, Artrip's commission was fixed and determinable on July 27, 1989, the date that Ruff received the Secretary's Notice of Levy.[2] It was fixed because the bankruptcy court in its March

---

[2]Ruff argues that the facts of this case are more similar to those found in *Tull v. United States,* 69 F.3d 394 (9th Cir.1995), and that therefore we should adopt the logic of that case. However, *Tull* is entirely consistent with the reasoning of *Hemmen,* and is distinguishable on its facts from both *Hemmen* and the case at bar. In *Tull,* the IRS served a notice of levy on the Secretary/Treasurer of a corporation with significant outstanding tax liabilities, including both payroll withholding and trust fund liabilities. At the time, the corporation was experiencing financial difficulties, and sought to auction off some of its equipment. The IRS served the notice prior to the auction, but after a contract to auction the property had been made between the corporation and an auction house. *Id.* at 395. The court held that the property of the corporation, in this case the right to the proceeds of the auction, was not fixed and determinable on the date of the levy. *Id.* at 397. It noted that the actual property to be sold had not been finally set as of the date of the levy, nor had a buyer come forward to purchase that property. Thus, the auction house "had an obligation to attempt to sell some as yet undetermined amount of property for an as yet undetermined price to as yet undetermined buyers." *Id.* The court reasoned, however, that "[a]n actual sale of property would establish both the price of that property and the duty of the buyer to pay the price, even if the date of payment were deferred." *Id.* at 398.

The court in *Tull* noted that the situation in *Hemmen* was quite different. In *Hemmen,* "the performance of the taxpayer had been completed and the amount he was owed for that performance had been determined, subject to a possible later defeasance in whole or part if funds were not available." *Tull,* 69 F.3d at 398. The situation in the instant case and in *Hemmen* are quite different from that in

2, 1989, order approved Artrip's appointment as broker for the estate with a 10% commission (to be shared equally with two other brokers), and because the underlying performance required of Artrip was complete. The buyer identified by Artrip entered into an agreement with Ruff to purchase those assets in April of 1989, and the sale was authorized by the bankruptcy court on May 24, 1989. The closing occurred on June 16, 1989. The commission was determinable because it was capable of precise measurement, having been established by previous court order. *See In re Central Micrographics Corp.,* No. 88-BKC-6S7 (Bankr.M.D.Fla. March 2, 1989) (Order appointing Artrip business broker). The bankruptcy court set a date for Artrip's fee hearing by notice to the parties almost two weeks before Ruff received the Notice of Levy. The fact that Artrip was entitled to a commission of $20,000 was never in dispute, and this is unaffected by the potential unavailability within the bankruptcy estate of the resources needed to pay that amount. Common sense dictates that the Treasury regulations at issue here be read this way.[3] If the regulations were meant to

_____

*Tull.* Here, as of the date of the levy, the sale was complete, and thus the underlying performance required of Artrip was complete. The amount of the commission due was firmly established, having been set by previous court order. The possibility of "later defeasance," as in *Hemmen,* has an impact on the fixed and determinable nature of the commission due Artrip.

[3]This common sense reading of 26 C.F.R. 301.6331-1(a)(1) is consistent with that found in cases interpreting other parts of the Treasury regulations governing the Service's levy power. In *In re Quakertown Shopping Center, Inc.,* 366 F.2d 95 (3rd Cir.1966), the court, interpreting section 301.6331-1(a)(3), held valid and enforceable a levy served on a receiver in bankruptcy against any property or rights to property due a creditor of the estate. The levy sought to secure assessed tax liabilities of the creditor. As of the date of the levy, however, the creditor

require, as Ruff argues, that the commission must be paid to the broker before it can be fixed and determinable, then they would have been written to so require.

Our holding is consistent with the purpose of the levy. The levy is not designed, as noted above, to give the government's claims superiority over the claims of others. Instead, the levy is intended only to protect the government's statutory interest in "property or rights to property," *see* 26 U.S.C. § 6332(a), and to assure the availability of the assets at issue once a final ordering of claims is made. *National Bank of Commerce,* 472 U.S. at 721, 728, 105 S.Ct. at 2924-25, 2928. The resolutions reached in *Hemmen* and in the case at bar merely insure that this interest is protected by putting the burden of monitoring the progress of the bankruptcy estate on the party who can most easily and efficiently carry it, the trustee.

The interpretation of the statute urged upon us by Ruff would read out of the statute the phrase "rights to property," and thus would strictly limit an IRS levy to "property" actually in the possession of the party upon whom the levy is served. Ruff's interpretation is also inconsistent with the regulations, and would

---

had only filed a claim against the bankruptcy estate, but the bankruptcy court had not yet allowed the claim. The court reasoned that the levy in this instance operated like an involuntary assignment of the creditor's claim against the estate to the United States. *Id.* at 98. Because the creditor was free to make a voluntary assignment of his claim without the permission of the bankruptcy court, the court found that it was similarly free to transfer its claim in this instance, albeit involuntarily. Thus, the receiver did have in his possession property of the taxpayer, namely the claim against the estate, and the levy validly functioned to transfer that property to the United States. *Id.*

eliminate from the property subject to levy "obligations which exist at the time of the levy." 26 C.F.R. § 301.6331-1(a)(1). It would render superfluous the regulation's elaboration to the effect that those obligations upon which levy may be made are those which are "fixed and determinable" although the right to receive payment thereof may be deferred. Ruff's interpretation would seriously undermine the Service's ability to protect the government's statutory interest.

Analysis of the relevant bankruptcy provisions governing the payment of professionals from the assets of the estate reinforces our conclusion that Artrip's commission was fixed and determinable as of the date of the levy. Section 328 of the Bankruptcy Code states:

> (a) The trustee ..., with the court's approval, may employ ... a professional person ... on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or *on a contingent fee basis.* Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, *if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.*
>
>       *     *     *     *     *     *
>
> (c) [Subject to exceptions not relevant here], the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 ... if at any time during such professional person's employment ... such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328 (emphasis added).

The bankruptcy court in this case approved Artrip's fee arrangement, including the provision setting his commission

percentage, on March 2, 1989, well before the Secretary served the Notice of Levy on Ruff. Because Artrip's prospect was the ultimate purchaser of the Central Micrographics property, and because the sale had been consummated, he had completed the tasks required of him to establish his entitlement to that commission as of the date of the levy. Section 328 significantly curtails the bankruptcy court's discretion with respect to the final payment of previously approved fees to professionals.

The bankruptcy court's power to alter the fee arrangement in no way diminishes the fixed and determinable nature of Artrip's commission arrangement, which was approved by the bankruptcy court on March 2, 1989. The district court noted that there were no facts upon which the bankruptcy court could have based a decision to reduce or eliminate Artrip's commission. *Ruff,* 179 B.R. at 972. There was no evidence that Artrip was no longer a disinterested person, nor that the bankruptcy court felt that the fee arrangement was improvident. The fact that the court scheduled a hearing on the fee indicates that there was money left in the estate with which to pay it. Thus, the district court concluded that Ruff could not have seriously questioned whether Artrip would receive his fee at the time that she received the Notice of Levy. *Id.*

### III. CONCLUSION

We conclude that Ruff was, within the meaning of 26 U.S.C. § 6332(a), "in possession of ... property or rights to property subject to levy" on July 27, 1989, the date on which she received the Secretary's notice of levy for Artrip's outstanding tax liabilities. She was therefore required to surrender that property

or the rights thereto to the Secretary.  She did not do so, and, pursuant to 26 U.S.C. § 6332(d)(1), is therefore personally liable to the Secretary for the value of the property not surrendered, in this case $20,000.  We affirm the ruling of the district court.

AFFIRMED.[4]

---

[4]We agree with the district court that the bankruptcy court case of *In re Ceafco,* 28 700, 1977 WL 1273 (S.D.Ala.Dist.Tax Sept. 21, 1977), was wrongly decided.  *Ceafco* involved facts almost identical to *Hemmen,* in that the IRS served a levy upon the trustee in bankruptcy seeking property of a taxpayer whose claims for administrative expenses had been allowed.  The bankruptcy court judge reasoned that only the bankruptcy court had the authority to determine how the assets of the bankruptcy estate were to be distributed, and because that determination had not yet been made, the trustee held no right to property belonging to the taxpayer, and therefore the levy was premature.  The *Ceafco* court overlooked the fact that an IRS levy does not determine that the government's claim is superior to that of other claimants.  *National Bank of Commerce,* 472 U.S. at 721, 728, 105 S.Ct. at 2924-25, 2928.  Thus, the levy does not interfere with a bankruptcy court's determination of how the assets of the estate are to be distributed.